# Illinois Official Reports

## Appellate Court

---

### *People v. Smith*, 2017 IL App (1st) 143728

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC SMITH, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-3728 |
| Filed | November 30, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-21018; the Hon. Brian K. Flaherty, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jonathan Krieger, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Dylan J. Rakestraw, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justices Gordon and Ellis concurred in the judgment and opinion. |

¶ 1 Following a jury trial, defendant Eric Smith was found guilty of first degree murder and attempted first degree murder and sentenced to a total of 58 years' imprisonment. On appeal, defendant contends that (1) the cumulative effect of multiple errors during his trial resulted in the jury being presented with emotional argument and inflammatory evidence which, in turn, created a pervasive pattern of unfair prejudice that deprived him of a fair trial, (2) his pretrial fitness hearing failed to meet minimal due process requirements where the trial court merely adopted an expert's conclusion based on stipulated testimony that he was fit to stand trial, (3) People's instruction No. 6 improperly limited the jury to return the same verdict for both first degree murder and attempted first degree murder, (4) People's instruction Nos. 17 and 18 misstated the law and confused the jury on how to reach its verdicts, (5) the trial court abused its discretion in sentencing him, and (6) he should be given an additional day of presentence custody credit. Because we find that the cumulative effect of multiple trial errors resulted in a pervasive pattern of unfair prejudice that deprived defendant of a fair trial, we reverse his convictions and remand for a new trial.

¶ 2                                I. BACKGROUND

¶ 3 During an October 2009 family gathering in South Holland, Illinois, defendant stabbed Fias Mannie to death and wounded his infant daughter, Brooklyn, who was in her father's arms. None of the family members present knew what precipitated the stabbings. Defendant ran from the scene, and the police arrested him a short time later. As a result, the State charged him with, *inter alia*, first degree murder and attempted first degree murder.

¶ 4                            A. Pretrial Proceedings

¶ 5 In May 2011, at defense counsel's request, the trial court ordered an evaluation of defendant to assess his fitness to stand trial and fitness to stand trial with medication. Dr. Mathew Markos, a psychiatrist, examined defendant, reviewed his records, and submitted a document to the court, opining that defendant was "mentally fit with medications." The court subsequently found defendant fit for trial with medications.

¶ 6 In June 2012, defendant hired a new attorney to represent him, who later requested that defendant be assessed for his sanity at the time of the alleged offenses and his ability to understand *Miranda* warnings. The trial court ordered the evaluation. Dr. Nishad Nadkarni, a psychiatrist, examined defendant, reviewed his records, and submitted a document to the court, opining that defendant "would have been legally sane at the time of the alleged offense[s]" as he "was not suffering from any mental disease or defect that would have substantially impaired his capacity to appreciate the criminality of the alleged act[s]." Dr. Nadkarni further opined that defendant would have been able to understand *Miranda* warnings at the time of his arrest.

¶ 7 Defense counsel subsequently requested a second opinion of defendant's sanity at the time of the alleged offenses from Dr. Georgia Conic, which the trial court allowed. Dr. Conic examined defendant, reviewed his records, and submitted a report to the court, diagnosing defendant at the time of the offenses with a "[s]chizophrenic disorder paranoid type" and a "[p]sychogenic fugue state," as well as an antisocial personality disorder. Dr. Conic opined that defendant "experienced a psychogenic fugue state and was unaware of his actions as

related to the stabbing of Fias and his daughter Brooklyn, and was not in control of himself." She further believed that "[t]he fugue state was probably induced by his mental illness or stress from situations at home."

¶ 8        In April 2014, the parties commenced jury selection for defendant's trial. During the questioning of a prospective juror, defendant began crying loudly. Defense counsel requested a break, which the trial court allowed. After the court instructed all of the prospective jurors to temporarily leave the courtroom, counsel informed the court that defendant was "upset" and had not taken his medication that morning. Defendant stated that he was "okay" to continue with jury selection, prompting the court to bring the prospective jurors back into the courtroom. Later, toward the end of jury selection, the State expressed "concerns" about moving forward in light of defendant's lack of medication that morning. The court consequently dismissed all of the prospective jurors, and the parties agreed to postpone defendant's trial.

¶ 9        At a subsequent court date, at the State's request, the trial court ordered another evaluation of defendant to assess his fitness to stand trial and fitness to stand trial with medication. Dr. Nadkarni again examined defendant, reviewed his records, and submitted a document to the court, opining that defendant was "fit to stand trial." Dr. Nadkarni also found that there was "no evidence that the defendant suffers from *bona fide* major mental illness, or cognitive impairment that would preclude him from" assisting in his defense and maintaining appropriate courtroom behavior. Dr. Nadkarni stated that "[a]ny observations to the contrary should be interpreted as volitional on the part of the defendant and secondary to documented malingering of mental impairments, as well as marked character pathology." Additionally, Dr. Nadkarni determined that defendant's medication did not impact his fitness and he did not need "psychotropic medication in order to maintain his fitness or functioning." Lastly, Dr. Nadkarni referred the court to his psychiatric summary "for the basis of [his] opinion."

¶ 10        On June 17, 2014, the trial court held a fitness hearing where the State and defense counsel agreed to proceed by stipulation. The parties stipulated that, if Dr. Nadkarni had testified, he would have opined that defendant was "fit to stand trial." The court asked if there was any other evidence, but neither side offered any additional evidence. The court subsequently found defendant fit to stand trial without further comment, and his case proceeded to trial.

¶ 11                                    B. Opening Statements

¶ 12        The State began its opening statement by telling the jury that Fias Mannie was "a newlywed," "a loving husband," a "loving father to two beautiful girls," and "a spiritual man." The State remarked that he had fasted the week prior to his death as part of his spirituality and invited family members over for a dinner to break the fast. The State then commented that "Fias was everything that the defendant is not," which prompted an unsuccessful objection from defense counsel. Following the completion of the State's opening statements, counsel moved for a mistrial arguing that the State's comments were both argumentative and prejudicial. The trial court denied the motion, finding the State's comments proper and merely what its evidence planned to show. The court further observed that it could not "think of an opening statement where the [S]tate's not going to want to paint the defendant in a negative light."

¶ 13        In defendant's opening statement, defense counsel tacitly acknowledged that defendant committed the alleged acts but told the jury that it would hear evidence that he had "severe

- 3 -

mental problems," which caused him to not understand his actions and to not be criminally responsible for them.

¶ 14                    C. The State's Case-in-Chief

¶ 15    The evidence in the State's case-in-chief revealed that, in October 2009, Fias Mannie lived in South Holland along with his wife, Shavon Mannie, and their daughters, Lerrick and six-month-old Brooklyn.[1] Shavon's brother was Floyd Wimberly. That month, defendant and his brother, who were cousins of Wimberly's wife, were staying at Wimberly's house.

¶ 16    On October 23, defendant helped Wimberly clean out a neighbor's house, during which Wimberly handed him a box of knives to throw away in a dumpster outside. Wimberly assumed that defendant threw them away as instructed. The next day, defendant accompanied Fias and his family, as well as Wimberly and his family, to church services. During the services, defendant was listening, clapping, and singing along to the hymns. At the completion of the services, many people, including defendant, hugged one another. Afterward, Fias invited the Wimberly family to his house for a dinner the following day to celebrate the completion of a week-long religious fast he had undertaken.

¶ 17    On October 25, defendant and the Wimberly family arrived at Fias's house. Defendant greeted Fias, shook his hand, and played with the family dog. After the families ate dinner, some of them watched a Chicago Bears game. Later in the evening, Fias, Brooklyn, and defendant were alone in the living room together. Fias was standing against a wall holding Brooklyn in his arms while he watched the football game. Up until this point, according to both Shavon and Wimberly, Fias and defendant seemed to be getting along well without any semblance of contention. Defendant was pleasant, acting normal, had not raised his voice, and never had an argument with Fias.

¶ 18    Shavon briefly went upstairs and when she returned downstairs, she observed defendant "swinging" at Fias, who was still holding Brooklyn. She yelled for Wimberly to help, who rushed into the living room. Shavon noticed a knife in defendant's hand, and when she looked back at Fias, she saw blood gushing from his face. Wimberly noticed blood coming through Fias's shirt and also saw a knife in defendant's hand, which he recognized as one of the knives he had given defendant to throw away two days prior. Wimberly immediately grabbed defendant, threw him against the wall, and eventually pushed him outside of the house. Defendant, however, wrestled himself away from Wimberly, jumped over a fence, and ran away.

¶ 19    Fias also ran out of the house where a neighbor, Kelly Heitmann, observed him covered in blood. She called 911 and tried to help him by putting pressure on a wound on his neck. The 911 operator had difficulty understanding Heitmann, which caused her to throw her phone in frustration. Heitmann's husband picked up the phone and continued speaking with the operator. While Heitmann was aiding Fias, he began choking on his own blood, and she noticed his eyes roll back into his head. Heitmann told Fias "it was okay if he needed to leave" and said a prayer for him.

¶ 20    The State played the 911 call from Heitmann for the jury. In the call, Heitmann can be heard struggling to inform the operator of her address, clearly panicked and overwhelmed.

---

[1]Because multiple members of the Mannie family are referenced throughout, we will address them by their first names.

After Heitmann disappeared from the call, her husband appeared on the call and informed the operator of the address while also observing that Fias was "bleeding all over" from his neck. Crying and hysteria can be heard in the background.

¶ 21 Paramedics arrived to the scene shortly thereafter and transported both Fias and Brooklyn to the hospital. Fias eventually died as a result of multiple stab and incised wounds as well as congestion of his right lung. Brooklyn had a small gash on her cheek and a large one above her mouth and below her nose. Her injuries required surgery.

¶ 22 Meanwhile, at the scene, Wimberly talked to the police and identified defendant as the offender. South Holland police officer Robert Williams found defendant, approached him, and asked him to identify himself. Defendant told Officer Williams that he was "Eric Smith from Michigan," and Officer Williams arrested him.

¶ 23 At the police station, South Holland police detective Chris Lareau interviewed defendant and advised him of his *Miranda* rights. Defendant stated that he understood his rights and agreed to talk. Detective Lareau found defendant's responses to the questioning to be appropriate and thought defendant appeared "inquisitive" about the police's knowledge of the events.

¶ 24 Near Fias's house, the police recovered two knives. One was the knife that Wimberly had seen defendant with during the incident and the other was a knife that Wimberly later discovered had been taken from a drawer in his house.

¶ 25 D. Defendant's Case-in-Chief

¶ 26 In defendant's case-in-chief, Patricia Smith, defendant's mother, testified. She recounted that, during a two-week period in August 2009, defendant exhibited strange behavior, including hiding in a closet, being afraid to sleep by himself, and commenting that he was hearing voices. Because of his fears, defendant began sleeping in Smith's bed, something he had never previously done, even as a child. As a result, Smith took defendant to see a psychologist in their hometown of Saginaw, Michigan, named Dr. Georgia Conic. In October 2009, Smith thought that defendant was "doing better" and could potentially find a job in the Chicago area, so she sent him to stay with Wimberly.

¶ 27 Dr. Georgia Conic testified as an expert in the field of psychology. She stated that she first met defendant in August 2009 when Smith brought him to her office based on Smith's concerns over his recent behaviors, including increased agitation, paranoia, and fear that people were after him and his family. Dr. Conic evaluated defendant and observed that he appeared normal in some respects but also appeared to have some hallucinations. Ultimately, because he exhibited some symptoms consistent with schizophrenia and there had been a self-reported family history of it, Dr. Conic diagnosed defendant with schizophrenia and instructed him to have follow-up appointments with a psychiatrist, who could prescribe medication if necessary. Dr. Conic, however, acknowledged that normally a diagnosis of schizophrenia cannot be made unless a person had exhibited such symptoms for six months. As part of her evaluation, Dr. Conic examined defendant's antisocial behavior, where he scored a 70% antisocial rating. This rating was based on a history of rule breaking, reckless behavior, being argumentative with authority, verbal and physical fighting, and a pattern of poor impulse control. Dr. Conic stated that an antisocial personality disorder is not considered a mental illness but rather a mental disorder.

¶ 28	The next time Dr. Conic saw defendant was in July 2013, after he was charged for the instant offenses. In preparation for another evaluation of him, she reviewed police reports, witness statements, and defendant's own statements. However, she acknowledged she did not review his criminal history, a psychiatric summary of him by Dr. Markos, a psychiatric summary of him by Dr. Nadkarni, a clinical social work evaluation of him by licensed clinical social worker Janine Bostick, or his recent medical records. After Dr. Conic's evaluation of defendant, she concluded that he seemed "more rational," "more interactive," and generally "functioning better" than when she initially met him, but he could not emotionally connect to the fact that he had killed Fias. She also stated that, in statements defendant made to the police, he indicated that he had no recollection of the events, could not recall even being present when the stabbings occurred, stated he did not have a knife, and explained to the police the blood on his shirt had been there for days.

¶ 29	Dr. Conic ultimately opined that, on October 25, 2009, defendant was suffering from "schizophrenia paranoid type" and was in a "psychogenic fugue state" brought on by a combination of schizophrenia and stress at home. Dr. Conic explained that a fugue state was "a period of time where a person actually participates in actions that they are not aware of. They have a break from reality, and they are not functioning as their rational self." The fugue state can last for hours, and afterward, the person resumes normal functioning and has no recollection of what occurred during the fugue state. According to Dr. Conic, the conditions defendant suffered from that day resulted in him lacking the substantial capacity to appreciate the criminality of his conduct.

¶ 30	Dr. Conic acknowledged that some people "malinger," or falsely report the manifestation of psychological symptoms, in order to avoid prosecution. But she concluded that defendant was not malingering because it is "very hard to fake a fugue state," and he did not have the "need to calculate or manipulate thinking." Dr. Conic admitted she was unaware that other doctors had suspected defendant of malingering.

¶ 31	E. The State's Rebuttal Case

¶ 32	In rebuttal, the State called Dr. Nishad Nadkarni, a psychiatrist, who testified as an expert in forensic psychiatry. In March 2013, in preparation for an evaluation of defendant, Dr. Nadkarni reviewed his criminal history, a psychological assessment of him prepared by GEC Psychological Consultants from August 2009, the psychiatric summary of him by Dr. Markos, the clinical social work evaluation of him by Bostick, police reports, several witness statements, statements from him, a DVD of him being interviewed by the police, and his recent medical records.

¶ 33	Defendant's medical records revealed that he did not seek treatment for his mental health issues until six or seven months after his arrest, and there were "significant notations" that defendant was "malingering." Defendant's medications included one milligram of Risperdal, an antipsychotic and mood stabilizer, every 12 hours, which was a "very small dose," as people with "true mental illness like schizophrenia" require four to six milligrams of Risperdal per day. Dr. Nadkarni acknowledged, however, that defendant's medications were ones designed to treat people with a *bona fide* psychosis.

¶ 34	Dr. Nadkarni's review of the DVD revealed that defendant showed "no signs of any psychiatric or cognitive impairment." Rather, defendant appeared to be "interactive in a high and logical level" and "somewhat gamey in his demeanor." At one point, defendant was left

alone in the interview room and told himself that he had left the scene and was not there, which led Dr. Nadkarni to believe that defendant was acting rational and logical, but merely antisocial.

¶ 35    During Dr. Nadkarni's evaluation, defendant reported his symptoms as including paranoia and hallucinations but did so in a "stilted and artificial manner," which was "atypical of somebody who has a true, major mental illness." According to Dr. Nadkarni, people with true mental illnesses appear "very ill" and are "reluctant" to talk about their symptoms, which oftentimes makes a diagnosis difficult. Defendant, however, was "very well engaged" and called "attention to [his] symptoms." He also possessed a goal-oriented thinking process without any signs of hallucinations or psychosis, and he acted "interpersonally charismatic," which was also contrary to the typical person with schizophrenia who acts "very flat." Based on the evaluation, Dr. Nadkarni concluded that defendant did not demonstrate "any *bona fide* or true psychiatric or cognitive impairments."

¶ 36    Dr. Nadkarni also discussed the stabbing incident with defendant, who reported that, prior to it, he "was in a bad spirit" and heard voices and animals talking to him. Defendant stated that during the stabbings he suffered from "different psychiatric symptoms," felt "out of control," and possibly heard more voices. He told Dr. Nadkarni that he "just stabbed" Fias and "left the scene because [he] realized what [he] had done." Defendant acknowledged to Dr. Nadkarni that his actions were unlawful.

¶ 37    Dr. Nadkarni ultimately diagnosed defendant with malingering, which is "the creation or feigning of mental symptoms," a history of mood disorder, and an antisocial personality disorder, the latter of which was not a mental disease or defect but rather a behavior problem. Dr. Nadkarni opined that, at the time of the stabbings, defendant did not "manifest a *bona fide* or true mental disease or defect that would have substantially impaired his capacity to appreciate the criminality of the alleged acts."

¶ 38    When asked about a psychogenic fugue state, Dr. Nadkarni stated that only a "few dozen case reports" of a true fugue state had been documented and that most claims of such were really just malingering. Dr. Nadkarni, who had conducted over 3100 forensic evaluations in his capacity as a psychiatrist, could not answer whether a person in a fugue state would be able to appreciate the wrongfulness of his conduct because Dr. Nadkarni had never diagnosed anyone with a *bona fide* fugue state.

¶ 39                          F. Verdict, Posttrial, and Sentencing

¶ 40    Following closing arguments and deliberations, the jury found defendant guilty of first degree murder and attempted first degree murder. Following defendant's unsuccessful motion for a new trial, the trial court sentenced him to consecutive terms of 40 years' imprisonment for first degree murder and 18 years' imprisonment for attempted first degree murder, for a total of 58 years' imprisonment. This appeal followed.

¶ 41                                   II. ANALYSIS

¶ 42                               A. Denial of a Fair Trial

¶ 43    Defendant first contends that he was denied a fair trial due to the cumulative effect of multiple trial errors. Specifically, he argues that (1) the State made an improper and argumentative opening statement, (2) the trial court improperly allowed Kelly Heitmann's

overly emotional testimony, (3) the trial court erred in allowing the State to play the recording of Heitmann's call to 911, and (4) the State improperly emphasized portions of the emotionally charged evidence during its closing argument. Defendant does not assert that each of these errors alone warrant a reversal of his convictions but instead that the pervasive pattern of inflammatory argument and emotionally charged evidence together resulted in the jury deciding his case based on emotion rather than the decisive issue of his sanity. Defendant therefore concludes that he must receive a new and fair trial.

¶ 44 Under both the United States and Illinois Constitutions, due process guarantees the defendant, regardless of his guilt or innocence, a fair and impartial trial. *People v. Bull*, 185 Ill. 2d 179, 214 (1998) (citing U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2). In *People v. Blue*, 189 Ill. 2d 99, 119 (2000), a defendant made several claims of trial court and prosecutorial error during his trial. Our supreme court agreed that some of those claims amounted to actual error. *Id.* at 120. The court ultimately found that the cumulative effect of the errors "may have coerced the jury into returning a verdict more likely grounded in sympathy than on a dispassionate evaluation of the facts." *Id.* Accordingly, the court held that the defendant did not receive a fair trial, reversed his convictions, and remanded the matter for a new trial. *Id.* at 120, 140. We will utilize the framework of *Blue* to determine whether a similar result is warranted in this case.

¶ 45 Initially, we note that some of defendant's contentions of error have been preserved for review through contemporaneous objections and inclusion in a posttrial motion. See *People v. Leach*, 2012 IL 111534, ¶ 60. However, defendant acknowledges that some of his contentions of error have not been preserved for review. Regardless, in certain, unique circumstances and when the defendant's interest in receiving a fair trial is at stake, as we find is the case here, we may decline to apply the forfeiture doctrine. *Blue*, 189 Ill. 2d at 127. Moreover, "forfeiture is a limitation on the parties and not the reviewing court, and we may overlook forfeiture where necessary to obtain a just result." *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65. We therefore begin by examining each of the alleged errors individually.

¶ 46                                1. The State's Opening Statement

¶ 47 Defendant's first alleged error concerns the propriety of the following comments made by the State at the beginning of its opening statement:

"Fias Mannie. He was a newlywed and a loving husband. Only married for three months. He was a loving father to two beautiful girls, six-month-old Brooklyn and six-year-old [Lerrick]. He was also a spiritual man. And he had made a spiritual sacrifice. He invited his family over to watch the Bears game and to have Sunday dinner in celebration of his spiritual discipline. You see, he had fasted that week for what he wanted to come into his life. Little did Fias know that would actually mark the end of his life. Fias was everything that the defendant is not."

Defendant argues that the State's remarks were argumentative, improperly compared his character to the character of Fias, and improperly dwelled on Fias's family.

¶ 48 During an opening statement, the State generally has wide latitude in discussing the case. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). The purpose of an opening statement is to allow a party to remark generally and concisely about the facts and issues of the case. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 22. It should not become argumentative. *Id.* Given these limitations, the latitude afforded to the State during an opening statement may not be as great

as the latitude afforded to it during a closing argument. *Id.* In other words, statements made during an opening statement may be improper where those same statements may be proper during a closing argument. *Id.* Comments intended "only to arouse the prejudice and passion of the jury are improper." *Id.* ¶ 21. The State, however, may discuss the evidence that will be presented and matters that may be reasonably inferred from that evidence. *People v. Smith*, 141 Ill. 2d 40, 63 (1990). Challenged remarks during an opening statement must be viewed in context. *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 47.

¶ 49    Initially, the parties dispute the applicable standard of review. Defendant argues that we should review the opening statement *de novo* while the State argues we should review it for an abuse of discretion. Recent decisions from this court have used both standards. Compare *Jones*, 2016 IL App (1st) 141008, ¶ 23 (reviewing *de novo*), with *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 43 (reviewing for an abuse of discretion). We need not resolve this apparent conflict because under either standard of review, our conclusion would be the same.

¶ 50    First, the State properly discussed Fias being religious and spiritual, as these characteristics provided context to why defendant happened to be at his house on the day in question, *i.e.*, a family gathering to celebrate the ending of Fias's week-long religious fast. And, in fact, Shavon testified to these very facts. See *Smith*, 141 Ill. 2d at 63 (in an opening statement, the State may discuss what its evidence will show). The State cannot be faulted for discussing Fias's religion and spirituality when those two concepts were at the very heart of why the circumstances brought him and defendant together.

¶ 51    However, the State's comments, though fleeting, to Fias being a "newlywed," "loving husband," and "loving father" to two "beautiful" daughters when juxtaposed with its later comment that Fias was everything defendant was not were improper. "[A] victim does not live in a vacuum," and naturally the victim has family. *People v. Cloutier*, 156 Ill. 2d 483, 508 (1993). References to the victim's family are proper to the extent necessary to properly present the State's case, which occurs when such references are incidental and uncalculated. *Id.* However, these references are improper when they are deliberate attempts "to inject irrelevant and prejudicial matters into the trial." *Id.*

¶ 52    Here, the State's references to Fias's family were deliberate and intended to inject prejudice into defendant's trial, as the State sought to pit Fias—the loving family man with two beautiful daughters—against defendant, the antithesis. Not only were the statements calculated to inject prejudice, but they also were argumentative, inviting the jury to evaluate and compare the character of the two key figures in the case. If defendant is the opposite of Fias, the loving family man, then implicitly defendant must be cold and cruel. Although the State did not use a pejorative to describe defendant, such as calling him a "criminal" (*Jones*, 2016 IL App (1st) 141008, ¶¶ 24-25) or a "crack-head" (*People v. Deloney*, 359 Ill. App. 3d 458, 469 (2005)), the State's comments were intended to frame the jury's consideration of the two men as, in essence, good versus evil. See *People v. Johnson*, 208 Ill. 2d 53, 80 (2003) (finding that, during closing argument, it is improper to imply that the jury has to choose between " 'good and evil' "). These comments in conjunction were intended to invoke an emotional response in the jury and therefore improper.

¶ 53    Though the trial court instructed the jury that opening statements were not evidence immediately before the State gave its opening statement, the State's improper comments occurred during the jury's first introduction to defendant, as his attorney had not yet made an opening statement on his behalf. See *Jones*, 2016 IL App (1st) 141008, ¶ 25 (finding the

State's "derisive characterization" of the defendant as a " 'criminal' " during its opening statement particularly prejudicial to him "where it was the jurors' first introduction to him"). Consequently, it was improper for the State to use Fias's family as a mechanism to compare his character to that of defendant during its opening statement.

¶ 54                                   2. The Testimony of Kelly Heitmann

¶ 55        Defendant's second alleged error concerns the trial court allowing Kelly Heitmann's emotional testimony about Fias's suffering and her attempts to aid him despite the State already proving the death of Fias through other evidence. Defendant highlights that defense counsel noted for the record that, during Heitmann's testimony, she cried and was hysterical, which even resulted in a couple of jurors crying. Defendant argues that her emotionally charged testimony was prejudicial, especially in light of its minimal probative value.

¶ 56        At trial, Heitmann testified that she heard multiple people scream and observed Fias, who was "screaming very loud" in a "very-high pitched shrill," run across the street covered in blood. Heitmann called 911 and then, while she tried to help Fias, she noticed that his "eyes rolled back into his head" and he began "choking on his blood." Eventually, when Heitmann realized there was nothing that she could do to save him, she recited a prayer for him.

¶ 57        After providing this narrative of the events, Heitmann identified photographs taken from the scene of the crime, including of Fias's driveway, his bloody shirt, and her bloody shirt. These photographs were subsequently admitted into evidence. The State then showed her photographs of Fias deceased at the hospital, which included close-up views of his wounds, prompting defense counsel to request a sidebar. Counsel noted for the record that Heitmann had been "hysterical and crying through her whole testimony." He argued that her testimony was "not probative," but rather "incredibly inflammatory" and "way over the top," especially the portions about Fias choking on his own blood and Heitmann saying a prayer for him. Counsel additionally asserted that he had stipulated to the autopsy and was not contesting whether or not Fias was stabbed to death by defendant.

¶ 58        The State responded "that's the way that [Heitmann] recalls [Fias] appearing to her" and it only showed her the photographs "so she could identify the person that she's referring to as Fias." The trial court noted that a couple of the jurors were actually crying and found Heitmann's testimony to be "very overwhelming from an emotional point of view." Because whether defendant committed the acts that resulted in Fias's death was not at issue, the court precluded the State from showing the jury the photographs of Fias.

¶ 59        With this chronology of Heitmann's testimony in mind, we note that defense counsel never objected to her emotional narrative of events nor did he file a motion *in limine* to bar her testimony, let alone any portion of it. In light of this, defendant, in essence, asks us to find that the trial court should have *sua sponte* curtailed, excluded, or controlled Heitmann's emotional testimony.

¶ 60        It is well-established that the trial court has no duty to *sua sponte* exclude evidence when a party fails to make an objection. *People v. Driver*, 62 Ill. App. 3d 847, 852 (1978). However, the court does have a responsibility to ensure that a trial is "conducted in an orderly manner with proper decorum." *People v. Williams*, 201 Ill. App. 3d 207, 221 (1990). Emotional outbursts, such as a witness crying, do not require the court to order a mistrial because it is in the best position to determine the impact on a jury of such outbursts. *People v. Smith*, 242 Ill. App. 3d 344, 350 (1993). Still, the court must take appropriate measures under the

circumstances to ensure that the defendant receives a trial before a fair and impartial jury. *People v. McLain*, 226 Ill. App. 3d 892, 901 (1992). The court is entitled to considerable latitude and discretion in how it administers a trial. *People v. Schuld*, 175 Ill. App. 3d 272, 282 (1988).

¶ 61 In this case, the court had no duty to *sua sponte* prevent Heitmann from testifying or preclude certain portions of her emotional testimony. See *Driver*, 62 Ill. App. 3d at 852. However, that does not mean the court had no responsibility whatsoever in regard to her testimony. During the sidebar, the court observed that Heitmann's testimony was "very overwhelming from an emotional point of view" and caused some members of the jury to cry themselves. Although the court is in the best position to determine the impact on a jury of a witness's crying, this observation was a clear indication that Heitmann's testimony was exceedingly emotional and risked distracting the jury from the true issue at hand to reach a verdict based on the evidence. Once the court realized that Heitmann could not control her emotions, it should have taken some corrective action to best ensure that defendant received a trial before an impartial and fair jury.

¶ 62 For example, once Heitmann began crying hysterically, the trial court could have called for an immediate recess to allow her time to control her emotions. See *People v. Sambo*, 197 Ill. App. 3d 574, 583-84 (1990) (finding that the trial court properly found no mistrial was warranted after a witness "broke down and cried during her testimony" because the court "ordered a recess immediately after [she] cried"). The court also could have immediately provided the jury with a curative instruction such as "[n]either sympathy nor prejudice should influence you" (see Illinois Pattern Jury Instructions, Criminal, No. 1.01(5) (4th ed. 2000)), an instruction the court actually provided the jury before deliberations. But by doing neither during Heitmann's clear emotional outburst and merely holding a brief sidebar well after the fact, the court abused its discretion.

¶ 63 ### 3. The Recording of Heitmann's 911 Call

¶ 64 Defendant's third alleged error concerns the trial court's ruling on the admissibility of the recording of Heitmann's 911 call. At trial, after the court precluded the State from introducing the photographs of Fias deceased at the hospital, the State indicated that it would introduce the recording of Heitmann's 911 call. Defense counsel, however, objected to the introduction of the recording as being unduly inflammatory and prejudicial. The court responded that, during the cross-examination of Wimberly earlier in the trial, counsel attempted to impeach him on where he stated Shavon was located when she called for his help, which was outside the defense's "theory" of the case. The court further observed that, during a sidebar related to counsel's attempted impeachment of Wimberly, counsel justified his questioning because he did not "know what's going to come up" later. The court similarly found that the State did not "know what's going to happen down the road" and had to prove its case beyond a reasonable doubt. Based on this reasoning, the court allowed the State to play the recording of Heitmann's 911 call for the jury.

¶ 65 In the 911 call, Heitmann initially exclaimed "there's a man bleeding in the middle of the street" and "the whole family is screaming." She then struggled to inform the operator of her address, panting while appearing overwhelmed and panicked. After the operator understood the street address, the operator asked Heitmann what town she was located in. Heitmann responded that "he's dying, you don't understand" and disappeared from the call. She was on

the phone for approximately one minute. Heitmann's husband subsequently appeared on the call, and the operator again attempted to discern what town they were located in. He responded in a distressed manner "oh my god" and proceeded to inform the operator that he was in South Holland. The husband described Fias as being cut from the neck and "bleeding all over." The husband continued talking to the operator, who informed him that someone needed to use a clean cloth to put pressure on the wound. Eventually, the husband informed the operator that police had arrived. During the entire 5½-minute call, crying and mostly unintelligible screaming is heard in the background.

¶ 66    Evidence is admissible at trial "if it is relevant and its probative value is not substantially outweighed by its prejudice." *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 93. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Evidence that is not relevant is inadmissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011).

¶ 67    Recordings of 911 calls "will not be excluded merely because it may prejudice the accused or because it might arouse feelings of horror or indignation in the jury." *People v. Williams*, 181 Ill. 2d 297, 314 (1998). Rather, the trial court must weigh the probative value of the recording against its prejudicial effect, which depends upon the specific circumstances of the case. *Id.* "[P]rejudice means an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror." (Internal quotation marks omitted.) *People v. Lewis*, 165 Ill. 2d 305, 329 (1995). The admissibility of a 911 recording is within the court's discretion, and we will not interfere with the ruling absent an abuse of that discretion. *Williams*, 181 Ill. 2d at 314. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 68    In this case, assuming *arguendo* that the 911 recording was relevant to the State's case-in-chief, *i.e.*, having some tendency to prove that defendant's acts caused Fias's death, an element of first degree murder (see 720 ILCS 5/9-1(a) (West 2014); *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 38 n.1), its admission served primarily to inflame the passion of the jury. At this point in the trial, defendant had already stipulated to the autopsy report, which demonstrated that Fias died from multiple stab and incised wounds, and it was undisputed that defendant stabbed Fias and Brooklyn. Furthermore, Heitmann herself had already testified that she observed Fias running across the street covered in blood, called 911, and tried to assist him. Though evidence cumulative to oral testimony may be admissible (see *Williams*, 181 Ill. 2d at 315), the recording included exceptionally emotional evidence, the introduction of which served no clear purpose other than to give the jury a real-time look at the moments immediately after the stabbings and the resulting emotions of horror and shock experienced by the people at the scene. Notably, the 911 recording provided no insight into the actual stabbings, what precipitated them, or defendant's sanity. The prejudicial effect of introducing the recording substantially outweighed what little probative value it had, and the court's decision to allow it into evidence was unreasonable to the degree that no reasonable person would agree. Therefore, the recording should have been deemed inadmissible.

¶ 69    The State, however, argues that the recording was necessary because defendant had not pled guilty, thus placing all aspects of the offenses at issue, and defense counsel stated during trial that he intended to challenge the "overall composition" of the State's case. Defense

counsel made this remark in the sidebar during his cross-examination of Wimberly and attempted impeachment of Wimberly concerning where Shavon was located when she called for his assistance. During the sidebar, the trial court asked counsel why he was attempting to impeach Wimberly on a collateral matter when the decisive issue of the case was defendant's sanity. Counsel responded that, while the court was correct regarding sanity being the critical issue, he could not ignore "an obvious contradiction" and thought he "could argue the overall composition of the case, how the case is being put together." The court replied that it did not know how impeaching Wimberly on a collateral matter would help defendant's case but allowed counsel to proceed. Counsel stated that "we don't know what will develop down the road" and that he would make his point and move on.

¶ 70      While defense counsel clearly stated that he could possibly challenge the overall composition of the State's case, notwithstanding the fact that this would have directly contradicted his theory of the case, opening statement, and the expected testimony of his expert witness, this assertion by counsel still does not mean the 911 recording was admissible. Even assuming that counsel might later change his theory of the case, the 911 recording was cumulative to other properly admissible evidence and did not materially advance the State's case. Thus, the prejudicial effect of introducing the recording would still substantially outweigh its probative value.

¶ 71      Lastly, we find the State's reliance on *People v. Jurczak*, 147 Ill. App. 3d 206 (1986), for the proposition that the trial court properly admitted the 911 recording misplaced. In *Jurczak*, the defendant had stabbed his wife to death shortly after she called 911 for help and while the call was still connected. *Id.* at 208. The recording of her call was played during the defendant's jury trial. *Id.* at 210. In the defendant's case-in-chief, he raised the defense of insanity and testified, admitting that he stabbed his wife to death. *Id.* at 211-12. The jury ultimately found the defendant guilty of murder but mentally ill. *Id.* at 212. On appeal, the defendant contended that the trial court erred in allowing the State to play the 911 recording for the jury because it was gruesome in nature and had no probative value on his insanity defense. *Id.* This court disagreed, finding that, despite the gruesome nature of the recording, it "was the most probative evidence available of the actual commission of the crime" given that no one had witnessed the actual commission of the crime except the defendant. *Id.* at 213. This court also found that the recording was relevant to the defendant's insanity defense because it showed "how the killing occurred and by providing the jury with information it needed to determine the weight to give to the expert testimony on sanity." *Id.* at 214.

¶ 72      Here, in contrast to *Jurczak*, the 911 recording was not probative to the actual commission of the crime because Heitmann never witnessed the stabbings, and it had no relevance to defendant's insanity defense. *Jurczak* is therefore inapposite. Accordingly, we find that the trial court abused its discretion when it allowed the State to play the 911 recording for the jury.

¶ 73                                4. The State's Closing Argument

¶ 74      Defendant's fourth alleged error concerns multiple comments made by the State during its closing argument. First, he points to the State's reference to Fias as a "newlywed" who encountered "an amazing woman" in Heitmann. Defendant next highlights the following comments:

> "Imagine, there is a man bleeding, running at her. She doesn't run away. She goes to him. And he says, 'I think that I am going to fall out.' And she grabs him, and she helps

him down to the ground. She let's this bleeding stranger land on her. And then she begins applying pressure to the wound, again, while this defendant is running through dark backyards, tossing everything he has."

Finally, defendant notes that the State recalled that Heitmann said a prayer for Fias when she realized that he was about to die. Altogether, defendant argues this portion of the State's closing argument repeated and exacerbated the emotional content of its case.

¶ 75 The State has wide latitude during a closing argument (*People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)), where axiomatically argument is permitted. Remarks that may be improper in an opening statement may nevertheless be proper in a closing argument. *Jones*, 2016 IL App (1st) 141008, ¶ 22. In a closing argument, the State may comment on the evidence presented at trial and draw reasonable or fair inferences from that evidence, even if they reflect poorly on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). However, "[c]losing argument must serve a purpose beyond inflaming the jury's emotions." *Thompson*, 2016 IL App (1st) 133648, ¶ 48. The appropriate standard of review is currently uncertain. In *Wheeler*, 226 Ill. 2d at 121, our supreme court applied *de novo* review, while in *Blue*, 189 Ill. 2d at 128, the court reviewed the propriety of a closing argument for an abuse of discretion. See *People v. Donahue*, 2014 IL App (1st) 120163, ¶¶ 102-03 (acknowledging the conflict regarding the standard of review). However, we need not resolve this conflict, as our conclusion would be the same under either standard.

¶ 76 Here, all of the complained-of remarks are based on the evidence presented at trial, such as Fias being a "newlywed," or reasonable inferences from the evidence, such as Heitmann, who tried to save a stranger's life, being an "amazing woman." None of the State's comments were overly inflammatory, and it was merely reviewing the evidence at trial with the jury. Given the wide latitude the State has during its closing argument, we cannot find these comments improper.

¶ 77 5. Cumulative Effect of the Errors

¶ 78 In light of the foregoing, we find that defendant has raised three valid trial errors. This case at its core was gruesome and tragic, as it involved the stabbing death of Fias and the stabbing of his six-month-old daughter Brooklyn, all in front of family and neighbors. These facts cannot change. But through the combination of errors, overwhelming and unnecessary emotion was injected into defendant's trial. In the State's opening statement, the jury's first introduction to defendant, the State improperly sought to pit good in the form of Fias versus evil in the form of defendant. The trial court then allowed Kelly Heitmann to cry hysterically throughout her testimony, which resulted in members of the jury crying, without any attempt to help reign in her emotions or cure any possible prejudice on the jury. Finally, the court allowed the highly inflammatory 911 recording to be played for the jury during Heitmann's testimony, which only further exacerbated her emotional testimony.

¶ 79 There was a real risk that these errors, regardless of the strength or weakness of the State's case, compelled the jury into rendering verdicts grounded in compassion rather than a dispassionate evaluation of the facts and the decisive issue of defendant's sanity. See *Blue*, 189 Ill. 2d at 120, 139. Together, these errors created a pervasive pattern of unfair prejudice that deprived defendant of his right to a fair trial. See *id.* at 139. Accordingly, due process demands that we reverse his convictions and remand the case for a new trial. See *id.* at 140.

B. Fitness Hearing

¶ 81    Although we have found that defendant is entitled to a new trial due to the cumulative effect of multiple trial errors, we still must address some of his additional contentions of error, beginning with the propriety of his pretrial fitness hearing. We note that, if we were to find a deficiency in defendant's fitness hearing, the appropriate remedy would be a retrospective fitness hearing in which the trial court would properly determine whether he was fit to stand trial. See *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 38 (remanding for a retrospective fitness hearing after a deficient fitness hearing); *People v. Cook*, 2014 IL App (2d) 130545, ¶ 22 (same). At the retrospective fitness hearing, if the court found defendant fit, then his convictions would stand. See *Cook*, 2014 IL App (2d) 130545, ¶ 22. Alternatively, if the court found defendant unfit, then it would be required to vacate his convictions and provide him a new trial. See *Gipson*, 2015 IL App (1st) 122451, ¶ 38.

¶ 82    Obviously, if defendant's fitness hearing was sufficient, we would still be reversing his convictions based on the trial errors. On the other hand, if his fitness hearing was deficient, we would still be granting him a new trial based on the reversal of his convictions. Thus, the propriety of his fitness hearing is moot. However, because it is possible his fitness to stand trial reemerges as an issue upon remand, we address the sufficiency of his fitness hearing.

¶ 83    Defendant contends that the trial court's June 17, 2014, fitness hearing was constitutionally deficient because instead of making its own independent conclusion as to his fitness to stand trial, the court merely adopted the opinion of Dr. Nadkarni as provided in the stipulated testimony. The following is the entirety of defendant's fitness hearing:

"MS. CORBIN [Assistant State's Attorney]: *** We are in receipt today of the psychiatric summary. So, to that end we can now proceed by way of stipulation.

THE COURT: All right.

MR. FULTON [defense counsel]: That's correct.

MS. CORBIN: It is stipulated by and between the parties that pursuant to Your Honor's latest order Doctor Nishad Nadkarna [*sic*] he would testify that pursuant to Your Honor's order on June 4, 2014 he examined the defendant, Eric Smith, to render an opinion regarding Mr. Smith's fitness to stand trial and fitness with medication. It would be Doctor Nishad Nadkarna's [*sic*] testimony within a reasonable degree of medical and psychiatric certainty that the defendant, Mr. Smith, is in fact fit to stand trial. So stipulate?

MR. FULTON: So stipulated.

THE COURT: Okay. Any other evidence?

MR. FULTON: Not from us, Judge.

THE COURT: Defendant fit to stand trial."

¶ 84    The fourteenth amendment's due process clause precludes the prosecution of a defendant who is unfit to stand trial. *People v. Holt*, 2014 IL 116989, ¶ 51. A defendant is presumed fit to stand trial but will be deemed unfit if a mental or physical condition prevents him from understanding the nature and purpose of the proceedings against him or assisting in his defense. 725 ILCS 5/104-10 (West 2014). The issue of a defendant's fitness to stand trial may be raised by the trial court, the defense, or the State at any time before, during, or after trial, and once a *bona fide* doubt as to his fitness has been raised, the court must order a behavioral clinical examination of the defendant by a licensed physician, clinical psychologist, or

psychiatrist. 725 ILCS 5/104-11(a), (b), 104-13(a) (West 2014). After the court has ordered an examination and received the corresponding report, it "shall conduct a hearing to determine the issue of the defendant's fitness." 725 ILCS 5/104-16(a) (West 2014). "On the basis of the evidence before it, the court *** shall determine whether the defendant is fit to stand trial ***." 725 ILCS 5/104-16(d) (West 2014).

¶ 85　　The trial court's determination that the defendant is fit to stand trial will not be reversed unless the court has abused its discretion. *People v. Contorno*, 322 Ill. App. 3d 177, 179 (2001). But because constitutional due process concerns are present, "the record must show an affirmative exercise of judicial discretion regarding the fitness determination." *Cook*, 2014 IL App (2d) 130545, ¶ 13.

¶ 86　　During a fitness hearing, "the trial court may consider an expert's stipulated testimony to assess a defendant's fitness but may not rely solely on the parties' stipulation to an expert's *conclusion* that the defendant is fit." (Emphasis in original.) *Gipson*, 2015 IL App (1st) 122451, ¶ 30; see also *Contorno*, 322 Ill. App. 3d at 179 ("A trial court's determination of fitness may not be based solely upon a stipulation to the existence of psychiatric conclusions or findings."). The ultimate decision of the defendant's fitness must be made by the court, not the expert, and thus, the "court must analyze and evaluate the basis for an expert's opinion instead of merely relying upon the expert's ultimate opinion." *Contorno*, 322 Ill. App. 3d at 179. The defendant's due process rights will not be satisfied if the trial court fails to independently inquire into the defendant's fitness and, instead, exclusively relies on the parties' stipulation. *Cook*, 2014 IL App (2d) 130545, ¶ 15. However, the defendant's due process rights will be satisfied if the court's determination of fitness is based not only on a stipulation but also on additional evidence of his fitness, such as the expert's report or its own observations of the defendant. *Gipson*, 2015 IL App (1st) 122451, ¶ 30.

¶ 87　　In the present case, defendant's fitness hearing was brief and consisted solely of the stipulated testimony from Dr. Nadkarni. Following his stipulated testimony, the only statement from the court was: "Defendant fit to stand trial." Based on only this statement, the record does not demonstrate that the court affirmatively exercised its judicial discretion in concluding defendant was fit to stand trial. Such an independent inquiry was especially necessary here because defendant initially had been found fit to stand trial but with medication. Although the court may have made a determination of defendant's fitness without relying solely on the stipulated testimony of Dr. Nadkarni, the record fails to show an independent inquiry. Therefore, defendant's fitness hearing did not satisfy his due process rights.

¶ 88　　As this court stated in *Cook*, 2014 IL App (2d) 130545, ¶ 20, "it is incumbent upon the court to make a record reflecting that it did more than merely base its fitness finding on the stipulation to the expert's ultimate conclusion." This record need not be detailed, but the court must show its reliance on more than just the stipulation, such as its review of the expert's report or its own observations of the defendant. See *Gipson*, 2015 IL App (1st) 122451, ¶¶ 29-30. This mandate is minimally burdensome to the court yet maximally protective to the defendant's due process rights. Consequently, if defendant's fitness to stand trial reemerges as an issue on remand, the trial court must ensure that his due process rights are satisfied.

C. Jury Instructions

¶ 90        Defendant's next two contentions concern the jury instructions used in his trial. Although we have reversed his convictions, thereby also making these contentions moot, they may reoccur upon retrial. We therefore address them.

¶ 91                              1. Split Jury Verdicts

¶ 92        Defendant first contends that People's instruction No. 6 improperly instructed the jury that it could only return the same verdict for both first degree murder and attempted first degree murder. People's instruction No. 6, based on Illinois Pattern Jury Instructions, Criminal, No. 2.01AA (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 2.01AA), instructed the jury that:

> "The defendant is charged with the offenses of first degree murder and attempt first degree murder. The defendant has pleaded not guilty. Under the law, a person charged with first degree murder and attempt first degree murder may be found (1) not guilty; or (2) not guilty by reason of insanity of first degree murder and attempt first degree murder; or (3) guilty of first degree murder and attempt first degree murder; or (4) guilty but mentally ill of first degree murder and attempt first degree murder."

¶ 93        The committee note to IPI Criminal 4th No. 2.01AA instructs the parties to list in the first sentence "all offenses specifically charged in the indictment, information, or complaint as to which the jury will receive a form of verdict." IPI Criminal 4th No. 2.01AA, Committee Note. The committee note further states that "[i]f the jury is to be instructed on more than one charge, then the third sentence of this instruction should be repeated for each such charge." *Id.* In People's instruction No. 6, despite defendant facing charges on both first degree murder and attempted first degree murder, the third sentence of IPI Criminal 4th No. 2.01AA was not repeated. Instead, the charges for first degree murder and attempted first degree murder were combined into one sentence. While we need not decide if this mistake prejudiced defendant, the parties should follow the committee note to IPI Criminal 4th No. 2.01AA upon retrial.

¶ 94                      2. Guilty but Mentally Ill Jury Instructions

¶ 95        Defendant next contends that People's instruction Nos. 17 and 18 misstated the law and confused the jury. These were the issues instructions, detailing to the jury how to reach one of the four possible verdicts—(1) not guilty, (2) not guilty by reason of insanity, (3) guilty, or (4) guilty but mentally ill—for the offenses of attempted first degree murder and first degree murder, respectively. Defendant highlights the following language in People's instruction No. 18:

> "A special verdict of guilty but mentally ill may be returned by you instead of a general verdict of guilty if you find each of the following circumstances to be present in this case:
>
> *First:* That the State has proved beyond a reasonable doubt that the defendant is guilty of First Degree Murder; and
>
> *Second:* That the defendant has not proved by clear and convincing evidence that he was insane at the time he committed the offense of First Degree Murder; and
>
> *Third:* That the defendant has proved by a preponderance of the evidence that he was mentally ill at the time he committed the offense of First Degree Murder.

If you find from your consideration of all the evidence that each one of these circumstances is present, you may return the special verdict finding the defendant guilty but mentally ill of First Degree Murder.

If you find from your consideration of all the evidence that the State has proved beyond a reasonable doubt that the defendant is guilty of First Degree Murder and if you find that either the second or third circumstance concerning the guilty but mentally ill verdict is not present, you should return the general verdict finding the defendant guilty of First Degree Murder." (Emphases in original.)

People's instruction No. 17 provided the jury with the same instruction except that it listed attempted first degree murder as the offense charged.

¶ 96 Defendant asserts that these instructions misstated the law and confused the jury in three respects. First, he argues that, if the second circumstance listed was "not present," then he had *not* "not proved" his insanity, meaning he actually proved his insanity by clear and convincing evidence and thus the jury would have to return a verdict of not guilty by reason of insanity. However, he points out that, if the second circumstance was not present, the instructions required the jury to find him guilty rather than not guilty by reason of insanity. Second, defendant argues that, even disregarding this double negative, the instructions misled the jury because they allowed it to return a guilty verdict if proof of insanity was "not present." However, he asserts that is not the law because the lack of insanity is a prerequisite, not a barrier, to a verdict of guilty but mentally ill.

¶ 97 Initially, we note that People's instruction Nos. 17 and 18 mirror Illinois Pattern Jury Instructions, Criminal, No. 24-25.01D (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 24-25.01D). The Illinois pattern jury instructions "have been painstakingly drafted," and trial courts "should not take it upon themselves to second-guess the drafting committee where the instruction in question clearly applies." (Internal quotation marks omitted.) *People v. Durr*, 215 Ill. 2d 283, 301 (2005). Indeed, Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) provides that when an Illinois Pattern Jury Instruction applies, it "shall be used, unless the court determines that it does not accurately state the law."

¶ 98 The language highlighted by defendant must be read in conjunction with the rest of People's instruction Nos. 17 and 18. Those instructions first directed the jury to determine whether the State had proved defendant guilty beyond a reasonable doubt. If the State did not, the instructions told the jury to return a not guilty verdict. If the State did, then they instructed the jury to consider whether defendant had proved the defense of insanity. The instructions subsequently stated:

"If you find from your consideration of all the evidence that the defendant has proved by clear and convincing evidence that he is not guilty by reason of insanity of First Degree Murder (or Attempt First Degree Murder) your deliberations should end, and you should return the verdict of not guilty by reason of insanity of First Degree Murder (or Attempt First Degree Murder).

If you find from your consideration of all the evidence that the defendant has not proved by clear and convincing evidence that he is not guilty by reason of insanity of First Degree Murder (or Attempt First Degree Murder), then you should continue your deliberations to determine whether the defendant is guilty but mentally ill of First Degree Murder (or Attempt First Degree Murder)."

When viewed in their totality, People's instruction Nos. 17 and 18 made clear that defendant could only be found guilty but mentally ill *after* the jury had determined whether or not he was not guilty by reason of insanity. Thus, if the jury reached this part of the instructions, *i.e.*, determining whether defendant was guilty but mentally ill, it would have already found that (1) the State proved defendant guilty and (2) defendant had failed to prove his insanity. Thus, we find no misstatements of law in the instructions. Moreover, even if these instructions could potentially confuse the jury based on their wording, the trial court would have no basis to deviate from them given that they accurately stated the law. See Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013).

¶ 99    Lastly, defendant argues that the instructions added another layer of confusion when they told the jury that, if he had proved he was mentally ill at the time he committed the offenses, it "may" find him guilty but mentally ill. Specifically, People's instruction Nos. 17 and 18 stated that "[a] special verdict of guilty but mentally ill may be returned by" the jury and later the jury "may return the special verdict finding the defendant guilty but mentally ill" if the three conditions necessary for a finding of guilty but mentally ill were satisfied, *i.e.*, (1) the State proved defendant's guilt, (2) he did not prove he was insane, and (3) he proved he was mentally ill.

¶ 100    The use of the language "may return" and "may be returned" in People's instruction Nos. 17 and 18 comes directly from IPI Criminal 4th No. 24-25.01D, which itself mirrors the applicable statutory law on findings of guilty but mentally ill. Guilty but mentally ill is not an affirmative defense raised by the defendant, but rather it is "an alternative *** finding that *may* be accepted, under appropriate evidence, when the affirmative defense of insanity is raised." (Emphasis added.) 720 ILCS 5/6-4 (West 2014); see also *People v. Wood*, 2014 IL App (1st) 121408, ¶ 74.

¶ 101    In a bench trial where the defendant has raised the defense of insanity, the trial "court *may* find the defendant guilty but mentally ill if, after hearing all of the evidence, the court finds that:" (1) the State proved his guilt, (2) he did not prove he was insane, and (3) he proved he was mentally ill. (Emphasis added.) 725 ILCS 5/115-3(c) (West 2014). Similarly, in a jury trial where the defendant has raised the defense of insanity, "the court, where warranted by the evidence, shall also provide the jury with a special verdict form of guilty but mentally ill, as to each offense charged and shall separately instruct the jury that a special verdict of guilty but mentally ill *may be returned* instead of a general verdict, but that such special verdict requires a unanimous finding by the jury that" (1) the State proved his guilt, (2) he did not prove he was insane, and (3) he proved he was mentally ill. (Emphasis added.) 725 ILCS 5/115-4(j) (West 2014).

¶ 102    Given that IPI Criminal 4th No. 24-25.01D mirrors the language of the statutory provisions governing findings of guilty but mentally ill, it accurately stated the applicable law. In turn, the use of the "may" language in People's instruction Nos. 17 and 18, which were based on IPI Criminal 4th No. 24-25.01D, were similarly accurate statements of law. Consequently, we find no error in People's instruction Nos. 17 and 18.

¶ 103    To the extent defendant argues that, as a matter of statutory construction, a verdict of guilty but mentally ill should be mandatory if the three circumstances are present, such a conclusion would still not invalidate IPI Criminal 4th No. 24-25.01D. The legislature has the responsibility of drafting statutes (see *People v. Sevedo*, 2017 IL App (1st) 152541, ¶¶ 22-23), and any change in the wording of the relevant statutes on findings of guilty but mentally ill

- 19 -

would have to come from the legislature, not this court. It follows that, even if we were to interpret the "may" language in the statutes as being mandatory rather than permissive, contrary to the common statutory connotation of the word (see *People v. One 1998 GMC*, 2011 IL 110236, ¶ 16; *People v. Reed*, 177 Ill. 2d 389, 393 (1997)), the statutory language would nevertheless remain the same. Thus, IPI Criminal 4th No. 24-25.01D would still accurately state the applicable law given that the relevant statutes would still contain the "may" language. Consequently, even if we were to find that a verdict of guilty but mentally ill should be mandatory if the three circumstances are present, the trial court would have no basis to refrain from using IPI Criminal 4th No. 24-25.01D. See Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013).

¶ 104                                    D. Remaining Contentions

¶ 105    Defendant's last two contentions are that the trial court abused its discretion in sentencing him to a total of 58 years' imprisonment and he is entitled to an additional day of presentence custody credit. Both claims are now moot given that we have reversed his convictions, and therefore we do not address either.

¶ 106                                        III. CONCLUSION

¶ 107    For the foregoing reasons, we reverse defendant's convictions and remand the matter for a new trial.

¶ 108    Reversed and remanded.