2021 IL App (2d) 170839-U
No. 2-17-0839
Order filed January 20, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-706 |
| CHRISTOPHER GERKEN, | ) ) | Honorable Robbin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1 *Held*: The trial court did not err in denying defendant's motion for mistrial after the discovery that member of the venire had discussed a prejudicial news article when it conducted a meaningful examination of the jurors to determine any prejudice. The trial court did not err in denying defendant's motion for mistrial following the emotional testimony of a police officer when it admonished the jury with a curative instruction. The State prosecutor's remarks during closing argument were reasonable inferences based on evidence adduced at trial.

¶ 2 After a jury trial, defendant, Christopher Gerken, was convicted of first-degree murder. He was sentenced to 60 years imprisonment. Defendant appeals, contending that he was denied a fair trial before an unbiased and impartial jury when the trial court denied his motion for mistrial during

voir dire, and a motion for mistrial following the emotional testimony of a police officer witness. Defendant further contends that the trial court's erroneous denials of his mistral motions were exacerbated by improper comments made by the State in closing arguments. Defendant argues that the State's comments misstated evidence and drew unreasonable inferences not reasonably drawn from evidence admitted at trial.

¶ 3                                          I. BACKGROUND

¶ 4    Defendant was arrested on October 7, 2015, and charged with murder (720 ILCS 5/9- 1(a)(1) (West 2014)) in the shooting death of Matthew Clark (Clark). A seven-count indictment was filed on November 17, 2015, charging defendant with four counts of first-degree murder, aggravated discharge of a firearm, and two counts unlawful possession of a weapon by a felon. Defendant presented a theory of self-defense at trial. The following recitation of facts was adduced from defendant's trial and its attendant proceedings.

¶ 5    On June 12, 2017, defendant filed a motion *in limine* to exclude the use of prior convictions to impeach his credibility. The trial court held a hearing on defendant's motion on June 23, 2017, and entered an order ruling that defendant's conviction for concealment of a homicidal death was admissible for the purposes of impeachment, but his conviction for aggravated unlawful use of a weapon by a felon was inadmissible.

¶ 6 On August 4, 2017, the *Daily Chronicle* published an article entitled "Sycamore man's murder trial starts Monday[:] Lawyer files motion stating he'll claim self defense." In addition to reporting details of the alleged crime, the article stated that the trial court "partially granted a motion by the defense on June 12 to bar information on [defendant's] 2010 conviction on charges of concealment of a homicide and unlawful use of a weapon in Cook County, on the grounds it

could create a biased jury." The article went on to state that the trial court "ruled the weapon charge could not be brought up, but that the concealment of a homicide charge could."

¶ 7    Defendant's trial began on August 7, 2017, with jury selection. While addressing the parties, the trial court stated "I am going to change our [jury] selection, just vary it a little bit based on the most recent De Kalb Chronicle article which extensively talked about rulings on pretrial motions." The prospective jurors were then brought into court and admonished by the trial court that they were "not to read any newspaper reportings of the trial, listen to any radio broadcasts, and *** not allowed to utilize social media by sending messages to anybody that you are going through the jury selection or have been selected as a juror ***."

¶ 8 Eight jurors had been selected when then-prospective Juror #9 had the following exchange with the trial court:

"Q. [Juror #9], earlier today I read from the charging document. I do want to explain that it is not evidence and cannot be considered in any way as evidence, but you heard that the charges were murder charges that bring the defendant before the court today. Based on what you heard this morning do you have any independent knowledge or any facts regarding this matter?

A. One girl this morning was telling everybody there was a murder trial today. She was showing them an article on her phone, but that's all I know.

Q. Where did that take place at?

A. Downstairs in the jury room.

Q. Downstairs? So she was discussing what she had read with all of the jurors downstairs?

A. No. She was just showing it to another one.

Q. Another person there, all right. Without any details, have you heard yourself or read anything about this case before today?

A. No.

Q. Based on what you overheard *** did you hear anything about what perhaps had gotten reported in the article that she was showing?

A. No. They were just discussing how long the trial should take and stuff.

Q. Thank you. And again, anything that you heard, did that have any impact on your ability to be fair and impartial should you be selected here today as a juror?

A. No."

Juror #9 was later asked by defense counsel how many prospective jurors witnessed the incident downstairs, to which she responded "I think there was probably about four of us that heard her say that, but there was only two that looked at the phone." Juror #9 acknowledged that the two prospective jurors looking at the phone were discussing the case and the *Daily Chronicle* article, but she had not read it herself.

¶ 9    Juror #9 was excused to the jury room and defense counsel made a motion for mistrial based on the article having tainted the jury pool. The trial court informed the parties that it intended to call back the eight jurors already selected in order to question them as to whether anyone had shared "any articles with them *** or discuss[ed] anything that those individuals had read regarding the case." After agreement to this approach by the parties, the trial court denied defendant's motion for mistrial.

¶ 10 Juror #9 was recalled as a prospective juror and examined by defense counsel. She denied having any knowledge of the contents of the article and further reiterated that the two prospective

jurors observing the article on a phone "were just discussing how long they thought the trial was going to last ***." The parties then accepted Juror #9 as a juror for trial.

¶ 11    The trial court then began conducting its inquiry of the eight previously selected jurors. The trial court engaged in the following exchange with Juror #1:

"Q. [Juror #1], earlier this morning when you where checking in for the jury in the jury waiting room, did anybody approach you or talk to you while you were waiting in line and talk about an article that they had read over the phone or show you anything that they had on their phone?

A. This morning? No.

Q. Yes. While you were waiting in the jury room after going through the check-in process, did anybody talk to you or did you overhear any conversations regarding what someone may have read *** on their phone regarding any articles about this case?

A. No, I did not."

The then had the following exchange with Juror #2:

"Q. Good afternoon, [Juror #2]. When you were in the jury assembly room this morning as you went through the process of checking in, when you were going through the line did anybody share with you any article that they may have read on their iPhone or talk to you at all about anything regarding this case?

A. No.

Q. Did you see anybody lifting up a telephone or talking to any other individuals regarding this case?

A. Not at all.

Q. When you were seated and waiting before you came up to court, did you overhear or hear anything about this case that another prospective juror might have been talking about?

A. Not at all."

Juror #3 was then recalled and had the following exchange with the trial court:

"Q. [Juror #3], earlier this morning when you were checking in as a juror and going through the line, did anybody share an article regarding this case from their iPhone or talk to you regarding this case?

A. None that I seen, no.

Q. When you were going through the line, did you see anybody hold up an iPhone and talk to anybody in the surrounding area about this case?

A. No, I did not.

Q. When you were seated waiting to come up to the courtroom, did you hear anybody talking about this case or any specifics or any articles regarding this case?

A. No, I did not."

Juror #4 was recalled and engaged with the trial court as follows:

"Q. [Juror #4], earlier this morning when you were going through the check-in process as you were coming into the courthouse when you were standing in line, did anybody share any information regarding the charges in a newspaper article that they may have read from their iPhone?

A. No.

Q. Did you see or observe anybody holding up an iPhone and discussing with anybody any newspaper articles?

A. No, I did not.

Q. After you checked in, when you were seated in the jury assembly room, did you overhear anybody talking about this case or any articles that may have been in the local newspaper?

A. No, I did not."

The court then recalled Juror #5 and engaged in the following exchange:

"Q. Good afternoon, [Juror #5]. [Juror #5], earlier this morning when you were going through the check-in process as you were coming in to the jury assembly room, did anybody talk to you regarding any article that they may have read in the newspaper regarding this matter?

A. No.

Q. Did you see anybody hold up an iPhone and talk about an article that they had read that morning or were reading at that time?

A. No.

Q. When you were seated after you went through the check-in process and you were sitting and waiting to be called into the courtroom, did you overhear anybody talking about this case or any articles that they may have read?

A. No."

Juror #6 was recalled and engaged in the following exchanged with the trial court:

"Q. Good Afternoon, [Juror #6]. [Juror #6], earlier this morning when you were checking in when you came into the jury assembly room when you were going through the line, did anybody share with you any article that they may have had on their cell phone or talked to you about anything regarding this case?

A. No.

Q. Did you notice anybody holding up a cell phone and talking to any individuals about this case or an article?

A. No.

Q. Later when you were seated down after going in through the check-in process and you were waiting to come up, did anybody share anything with you, any information regarding this case or share any articles with you?

A. No."

The trial court then recalled Juror #7 and engaged in the following exchange:

"Q. [Juror #7], earlier this morning when you were checking in as a prospective juror and you were going through the line, did anybody in the line talk to you regarding an article that they may have read on their iPhone?

A. No.

Q. Did you see anybody hold up an iPhone and talk to a group of people or any people as they were checking in?

A. No.

Q. After you were seated going through the check-in process and were sitting in the chairs, did you overhear or see anybody discussing this case?

A. No.

Q. And no one talked directly to you about the case as well?

A. No."

Juror #8 was recalled and had the following exchange with the trial court:

"Q. [Juror #8], when you came in this morning and you were going through the check-in process and were standing in line as you were checking in to the jury assembly room, did anybody share with you on their iPhone an article regarding this case?

A. No.

Q. Did you see any individual hold up an iPhone or talk to any other individuals in your general vicinity about this case?

A. I heard someone say that what the trial was about but nothing.

Q. When you said you heard them say what the trial was about, what did you specifically hear?

A. I heard it was a murder trial and that *** they were pleading not guilty.

Q. Did you hear any other specifics?

A. No.

Q. Was that person just talking to other people?

A. Yes.

Q. When you sat down after going through the process, did anyone around you continue to talk about the case or did you talk to anybody regarding the case?

A. No.

Q. And other than hearing that it was a murder trial and that they were pleading not guilty, you heard no other information regarding this case?

A. No.

Q. And you didn't read anything off the telephone that someone may have tried to share with you?

A. No."

Defense counsel then questioned Juror #8 as follows:

Q. Sir, when the individual that told you it was a murder trial and the defendant had pled not guilty, were you able to tell from what the source of their information was?

A. No. I wasn't really paying attention, to be honest, this morning.

Q. So you just heard that?

A. When they said there was two different trials, it's like I didn't know which one we were going to.

Q. Two different trials referencing two different cases in this building?

A. Yes, yes.

Q. And you remember hearing one of them was a murder?

A. Yes.

Q. And that's the extent of what you heard?

A. Yes."

The trial court then moved on to questioning more prospective jurors. Juror #10 stated that he had not seen anyone talk about the case or share anything on an iPhone. Juror #10 had heard nothing of the case against defendant prior to coming to the courtroom. Juror #11 stated that while going through the check-in process, he heard a woman say that the case was about a murder. Juror #12 stated that he worked at a gas company near the site of the alleged crime but could not recall any specifics. He did not see or hear anyone talking about the case or sharing an article on an iPhone when he reported for jury duty. Juror #10, Juror #11, and Juror #12 were selected without objection.

¶ 12 A prospective juror, not selected to sit on the jury, said that there was conversation "all over the room" about the article and the trial. He said he heard that the case may involve a drug

deal gone bad but did not know any of the specifics. Defense counsel renewed the motion for mistrial and marked the article as Defense Exhibit 1. He argued that the content of the article coupled with the conversations in the jury room would make it impossible to determine the damage done to the venire. In denying defendant's motion, the trial court stated that

"The Court has had an opportunity and has inquired of all jurors. Those eight that were seated yesterday I brought back each of them individually to talk to them whether they had referenced the De Kalb Chronicle article, what they knew about it in the jury room. Today is the only witness [sic] who indicated there was more than one area of people who were discussing it. He said people were sitting around talking about it, perhaps hearing a murder trial and how long it would take.

Every one of these potential jurors and those that have been selected were asked detailed questions by myself, the State, as well as [defense counsel], regarding what they had read, could they put aside any of the reading or the content of the DeKalb Chronicle article and only consider the evidence in the courtroom. Again, all agreeing that they would not discuss anything further with any of the jurors. I believe everyone had ample opportunity to question those jurors.

\*\*\*

I think it's not a correct statement by saying the article itself was making the rounds around the jury assembly room. I have not heard that other than from this juror who said he heard people talking about what type of trial they may be hearing. At the most, he indicated it was a drug deal gone bad but didn't know any specifics or details.

There's been nobody that's mentioned that they read regarding the pretrial rulings that the Court had made as well. That's not been any discussion [sic] with any of the jurors,

albeit it's difficult to have that kind of reporting done right before trial, especially when some of the contents I ruled inadmissible and then to have that printed in the paper, I can understand your concern. However, I don't believe that it's tainted the entire venire, and your motion for mistrial is denied at this time."

¶ 13 Following opening statements from both parties, the State began calling witnesses. Trevor Motsinger (Motsinger) testified that he was a long-time friend of defendant and Clark's girlfriend, Rebecca Griffith-Perez (Griffith-Perez). Motsinger met Clark through Griffith-Perez and learned he was a cocaine dealer. On the night of the shooting, he had known Clark for about a month. Prior to that night, Motsinger had acted as a middle man for cocaine transactions between Clark and others, including defendant. Motsinger knew Clark only as "Smokk."

¶ 14 On September 29, 2015, Motsinger facilitated a cocaine transaction between Clark and defendant. Defendant drove Motsinger to a residence belonging to Griffith-Perez where Clark was staying. Motsinger retrieved the cocaine from Clark inside the residence and brought it back to defendant waiting in his vehicle in the driveway next to the residence. After receiving the cocaine from Motsinger, defendant remarked that it felt short of the amount he agreed to purchase. Motsinger then went back inside the residence and told Clark of defendant's concern regarding the weight of his purchase. After weighing the cocaine, Clark realized that it was indeed short of the agreed upon weight. He corrected the oversight and Motsinger returned to defendant's vehicle with the cocaine. Defendant indicated to Motsinger that he was satisfied with the corrected weight.

¶ 15 Shortly after dropping Motsinger off at his home folowing the cocaine transaction, defendant sent Motsinger a text message that reiterated his dissatisfaction with the product's weight. The text further indicated that he wanted the oversight corrected or his money returned. Motsinger then texted Clark to inform him of defendant's additional complaint. After not hearing

a satisfactory response, defendant texted Motsinger again that evening and indicated that Motsinger owed him $50 from a prior marijuana transaction, which was going to be repaid either in money or cocaine by either Motsinger or Clark. Clark texted Motsinger that the weight was correct and contained an amount of cocaine above the agreed upon amount. Clark indicated in text to Motsinger that he would not be giving defendant money or cocaine and referred to defendant as "a bitch." Motsinger took issue with Clark's characterization of defendant and told Clark in text to not further insult his friend. Motsinger relayed Clark's messages to defendant. Defendant sent a message to Motsinger that read, "[I don't care] where it comes from. I want my shit one way or the other." No other texts were sent regarding this transaction until October 6, 2015.

¶ 16  On the evening of October 6, defendant texted Motsinger to let him know he was in search of 3.5 grams of cocaine. Motsinger then sent a text to Clark relaying defendant's request. Clark agreed to sell the cocaine for $275. At 9:37 p.m., defendant sent Motsinger a text saying he was outside of the house to pick him up in his Ford Windstar minivan. Defendant was drinking alcohol in the vehicle as they drove to meet Clark at Griffith-Perez's residence. Instead of parking in the driveway next to the residence, defendant parked on a nearby street. Defendant parked the minivan and told Motsinger to let Clark know that they had arrived. Defendant then pulled a pistol from either his lap or under his seat. Motsinger told defendant "[d]on't do it," meaning not to shoot or rob Clark. Defendant told Motsinger not to worry as he only intended to scare Clark with the gun. They began walking toward the residence when Motsinger suggested that they turn back. Defendant did not respond but eventually said "I'm not no bitch."

¶ 17  At 10:00 p.m., Motsinger sent Clark a text saying they had arrived and were outside the door of the residence. Motsinger walked up a stairway to the front door while defendant remained at the end of the stairway. When Clark opened the door he asked Motsinger where defendant was.

Motsinger pointed to defendant's location and Clark told defendant to come up the stairs. When Clark stepped out of the front door, he and defendant began "scuffling" with their hands; they were intertwined as if trying to grab something out of each other's hands. Defendant's hands were on Clark's hand and wrist with Clark attempting to pull away. Motsinger testified that he did not see anything in Clark's hands at that point. Clark then turned to retreat into the residence and defendant pulled the gun from the front pocket of his hoodie sweatshirt. As Clark was closing the door, defendant shot him through the door and fled. Motsinger stayed by the front door of the residence.

¶ 18 Motsinger then started knocking on the door of the residence when Clark opened the doorand announced that he had been shot. Motsinger called 911 to report the incident but told the dispatcher that he did not know who shot Clark. He also told the dispatcher incorrect informationas to which direction defendant fled. He testified that he gave this information because he knew defendant and was afraid of "what would happen to me or my family." While still on the call withthe dispatcher, Clark handed money and cocaine to Motsinger which he took to the back area of the residence and set on the windowsill with some other belongings. He denied entering the bedroom shared by Clark and Griffith-Perez.

¶ 19 Police arrived at the residence approximately three minutes after Motsinger made the 911call. Motsinger attempted to retrieve the money, cocaine, and other belongings from the windowsill but was caught by police. He continued to say to police that he did not know the shooter. He told police that an unknown man ran up to the residence and shot Clark before changing his story later that evening to say a person named "Serge" was the gunman. This was also false and Motsinger testified that these lies were told out of fear and protecting his family. Eventually, after speaking to his mother about the incident, Motsinger told police that defendant shot Clark.

¶ 20 Griffith-Perez testified that she had known Clark for four years and knew that he sold cocaine out of her residence. She had known Motsinger since childhood and described him as a good friend. On the night of the shooting, she testified that she was in bed when Motsinger arrived. She heard talking on the front porch but could not make out what was said before hearing the gunshot. Her daughter was sleeping on the couch in the living room at the time of the shooting, so she ran out to take her daughter to safety. She then saw Clark on the floor as he was shutting the door following the gunshot. She did not recall going inside and shutting the door when police arrived. Griffith-Perez said that she did not know there was a pistol in her bedroom or anywhere else in the residence.

¶ 21 Sergeant Jeff Weese (Weese) of the De Kalb Police Department testified that he was dispatched to the residence on the evening of October 6, 2015. When he arrived, other officers and emergency medical personnel were already on the scene. Weese was ordered to ride in the ambulance with Clark to Kishwaukee Hospital. The ride to the hospital took approximately five minutes wherein Weese had a short conversation with Clark to determine his name and other information. Upon arrival at the hospital, Weese stayed with Clark as they took him from the ambulance to the emergency room. Weese described Clark's breathing as "very labored" and thought it appeared he was going into shock. Weese went into hospital and testified that someone in the triage room asked Clark who shot him. Weese heard Clark say "I don't know who he is." When someone in the triage room asked Clark for a description of the shooter, Weese said that Clark responded "He's probably white. He was wearing a hoodie and he's a crackhead." A few minutes later, Clark's heart rate started to fall and, following CPR, he died. Throughout Weese's direct examination testimony, he repeatedly apologized to the trial court as he became emotional in recounting his time in the ambulance with Clark.

¶ 22 On cross-examination, Weese continued to become emotional during his testimony and apologized to the trial court. At the conclusion of Weese's testimony, the State requested a recess. As Weese left the witness box, he went to Clark's family and held them as they all cried together in close proximity of the jury. After the jury left the courtroom, defense counsel made a motion for mistrial, arguing that

> "I think that that's such a powerful display right before the jury in regards to this circumstance and I think it taints the jury. It inflames the jury. It inserts into this emotion that, Judge, this a court of law and again with all due respect to the family, that sort of display, especially connected with an officer of the prosecution in direct observation of the jury *** I think constitutes prejudice that is so great it's difficult to imagine that emotion that was just seen that I felt myself not impacting the jury."

The trial court denied defendant's motion for mistrial and stated

> "I understand your concerns. I don't think it rises to whether or not the defendant has been prejudiced so much that because of a display of human emotion at seeing someone pass away would be so prejudicial as to warrant a mistrial."

Upon the jury's return to the courtroom, the trial court gave an admonishment that neither sympathy nor prejudice should affect them.

¶ 23 Forensic pathologist Mitra Kalelkar testified that Clark's cause of death was a gunshot wound to the chest that perforated his lungs and liver.

¶ 24 Detective Kelly Sullivan had processed the scene at the residence and identified photographs depicting Clark's bedroom. In the photographs, Sullivan identified a plate near the bed topped with a substance that tested positive for cocaine. 19 baggies of cocaine packaged for sale and a jar of marijuana were found in Clark's bedroom. Sullivan concluded that this evidence

suggested a person engaged in drug activity resided in the room. Sullivan further identified a photograph of a backpack found in the bedroom that contained a loaded Ruger 9mm handgun and other items packed "fairly neat inside the bag."

¶ 25 An autopsy of Clark, performed by Illinois State Police forensic examiner Christina Davison, revealed that the bullet recovered was fired from a .357 magnum.

¶ 26 Detective Mark Nachman of the De Kalb Police Department testified that he was working on the morning of October 7, 2015, when he was ordered to go to the Peace Road exit off Interstate 88 in De Kalb. Detectives had been tracking defendant's phone and discovered that he was headed west towards De Kalb. At approximately 6:45 a.m., Nachman and another detective were waiting at the exit in a black, unmarked police vehicle equipped with the lights and sirens when they observed defendant's minivan approaching. Defendant pulled off the interstate and began heading north on Peace Road. Nachman pulled behind defendant's vehicle and activated the emergency lights. Defendant slowed down and pulled over briefly before continuing to drive. Nachman then activated the sirens and pursued defendant along with several other police vehicles, also equipped with activated lights and sirens. Defendant reached speed of up to 75 miles per hour while driving north on Peace Road before turning eastbound onto Route 38. Defendant continued to drive at high speed for some distance before meeting a police roadblock at the intersection or Route 38 and Route 47. Defendant then stopped his minivan in the middle of Route 38, opened his door, and got out with his hands in the air before being taken into custody.

¶ 27 Officer Steven Parsons testified that he pursued defendant in the minivan on the morning of October 7. After defendant was stopped and taken into custody, Parsons stood by with the minivan and waited for a tow truck to arrive. Parsons followed the tow truck to the De Kalb Police Department's secured impound area where the minivan was kept pending further investigation.

¶ 28 Detective Angel Reyes executed a search warrant on defendant's minivan in the DeKalb Police Department's impound area. Inside the vehicle, Reyes discovered a .357 Magnum revolver with five rounds of ammunition in the six-chamber cylinder.

¶ 29 After the State rested, defendant took the stand and testified that he had know Motsinger since he was 11 or 12 years old and sometimes bought cocaine from him. He recalled picking Motsinger up on the evening of October 6, 2015, to buy 3.5 grams of cocaine from Clark, whom defendant knew as Smokk. He denied using any drugs or drinking alcohol on the way to Clark's residence.

¶ 30 Defendant stated that he thought he was entering a dangerous situation upon arriving at Clark's residence based on the text messages regarding the September 29 transaction. He further sensed danger due to Motsinger having told him that Clark was a "gang banger," a Vice Lord. He elected to park his minivan down the street and walk with Motsinger. Defendant testified that he believed the September 29 transaction was short of the agreed upon amount because Motsinger took some for himself before giving it to defendant. He admitted that he had the .357 Magnum in his possession as they approached the residence.

¶ 31 Defendant testified that he sat down on a chair in the corner of the porch in front of the residence with Motsinger standing to his side. He only brought $225 of the agreed $275 for the cocaine. Defendant described Clark's demeanor upon coming out the front door as "sort of aggressive" and not amenable to defendant's suggestion that the shortage on the prior transaction amounted to $50, thus adjusting the then-present purchase from $275 to $225. Defendant recalled Clark saying "I already told you, bitch, you're not getting it," before swinging a fist at defendant. Defendant testified that he and Clark exchange punches before Clark reached into his waistband and pulled out a pistol. Defendant identified the Ruger 9mm handgun found in the backpack in

Clark's bedroom as the weapon Clark pulled. Defendant then pulled his own gun and fired a single shot while turned away from Clark, as he believed Clark was going to shoot him. He then fled, believing he could still be shot by Clark.

¶ 32 Defendant then drove to a couple different friends' homes in Maywood and North Lake. He did not know that he had shot Clark until the following morning. Defendant testified that he drove back to De Kalb on the morning of October 7 to go to work. When he realized he was about to be apprehended by police, he drove away to buy time. He phoned his girlfriend and apologized because he was about to be taken to jail.

¶ 33 The parties then made their closing arguments. The jury was then instructed on the charges in the indictment, as well as instructed on second-degree murder and self-defense. The jury found defendant guilty of first-degree murder and aggravated discharge of a firearm.

¶ 34 Defendant filed a motion for a new trial on September 11, 2017, and argued that the *Daily Chronicle* article discussed by jurors during *voir dire* and Sergeant Weese's emotional testimony followed by embracing the victim's family in front of the jury were each grounds for mistrial. On October 10, 2017, the trial court denied defendant's motion and largely reiterated the findings articulated for denying defendant's motions for mistrial during the trial. The trial court then sentenced defendant to 60 years imprisonment.

¶ 35 Defendant then filed this timely appeal.

¶ 36                                   II. ANALYSIS

¶ 37 Defendant contends that he was denied a fair trial before an unbiased and impartial jury. He identifies three issues in this appeal: (1) the trial court erred in denying his motion for mistrial following the discovery of jurors in the *venire* discussing the *Daily Chronicle* article; (2) the trial court erred in denying his motion for mistrial following the testimony of Sergeant Weese; and

(3) the State prosecutor misstated evidence during closing arguments and drew inferences not supported by the evidence presented.

¶ 38 We begin with defendant's contention that the trial court erred in denying his motion for mistrial following the discovery of jurors in the venire discussing the *Daily Chronicle* article. Defendant cites *People v. Keegan*, 52 Ill. 2d 147 (1971), in support of the argument that, because the nature of the offense and his theory of self-defense relied on credibility determinations, this court must find error with the trial court's denial of his motion for mistrial as the prejudicial article seen by jurors tainted his right to a trial free of prejudicial error.

¶ 39 A mistrial should be granted where a grave error has occurred, which denies a defendant fundamental fairness, such that continuation of the proceedings would defeat the ends of justice. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). "To prevail on appeal, [the] defendant must establish that there was a manifest necessity for the mistrial or that the ends of justice would be defeated by continuance of the trial; that is, that the jury was so influenced and prejudiced that it would not, or could not, be fair and impartial, and the damaging effect of the evidence could not be remedied by admonitions or instructions." *People v. Wills*, 153 Ill. App. 3d 328, 339-340 (1987).

¶ 40 It is inherent in a defendant's right to a fair trial that he receive a trial by an impartial juryfree from outside influence. A verdict must be based upon the evidence received in open court andnot from outside sources. *People v. Talley*, 152 Ill. App. 3d 971, 980 (1987); citing *Sheppard v. Maxwell*, 384 U.S. 333 (1966). When a trial court becomes aware that jurors have been exposed to news articles, the court must make a meaningful examination of the jurors to determine any prejudice. *Talley*, 152 Ill. App. 3d at 980. The question is whether the jurors have been influenced or prejudiced to the extent that they would not, or could not, be fair and impartial. *Id.* Each case must be determined on its own peculiar facts and circumstances, with due consideration to the

nature and character of the statements themselves. *Id.* A motion for a mistrial based on publication of a news item is addressed to the sound discretion of the trial court. *Id.* The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion. *Nelson*, 235 Ill. 2d at 435.

¶ 41 In *Keegan*, the defendant was charged with taking indecent liberties of a child. *Keegan,* 52 Ill. 2d at 148. After four jurors had already been selected, an article appearing on the front page of an evening newspaper was published, which stated that "the police had found color slides of nude and partially unclothed children in [the] defendant's home and that the court had suppressed this evidence on [the defendant's] motion." *Id.* at 154-55. The article also revealed that the defendant had been charged in four other similar complaints, the defendant had requested a different trial judge, and that the defendant's motion to dismiss had been denied. *Id.* The next day, prior to opening statements, the defendant's attorney moved for a mistrial. *Id.* at 154. Even though the motion was denied, the trial court allowed defense counsel to examine each juror regarding the article. *Id.* Two out of the twelve jurors stated that they had read the article, but said it would not influence them. *Id.* In remanding the cause for a new trial, our supreme court held it was "not prepared to speculate what the verdict might have been if two jurors had not read the prejudicial article." *Id.* at 155-56.

¶ 42 In reaching its decision in *Keegan*, our supreme court referred to its decision in *People v. Hryciuk*, 5 Ill. 2d 176 (1954). In *Hryciuk,* our supreme court stated that basing the determination solely upon the statements of the jurors ignores and evades the real issue; and that the determination of that issue must therefore rest in the sound judicial discretion of the court to reach an inference, from all the facts and circumstances, that a fair trial has, or has not, been interfered with. *Hryciuk*, 5 Ill. 2d at 184. The *Hryciuk* court went on to state that the most controlling fact or

circumstance to create such an inference is the character and nature of the prejudicial statements. *Id*. "Where the question to be decided is of a subjective character, impossible of measured accuracy, each individual case must be determined upon its own peculiar facts and circumstances." *Id*. at 185.

¶ 43 The facts of the present case are distinguishable from those in *Keegan*. Here, the *Daily Chronicle* article at issue was published prior to jury selection and the trial court addressed the parties as to its existence, as well as admonished each prospective juror that they were "not to read any newspaper reportings of the trial, listen to any radio broadcasts, and *** not allowed to utilize social media by sending messages to anybody that you are going through the jury selection or have been selected as a juror ***." When alerted by Juror #9 that two members of the venire were looking at a phone and discussing the article, each of the eight jurors already selected were brought back before the trial court for further inquiry. See *supra* ¶ 11. Of the jurors ultimately selected for trial, Jurors #8, #9, and #11 stated that they heard the case was about a murder. Only Juror #5, during original questioning, stated that approximately two days prior to *voir dire*, she had read "a little" on Facebook about the case, but only remembered that it was a "bad drug deal." She could not recall anything else about what she saw on Facebook. When recalled to answer questions specifically about the *Daily Chronicle* article, Juror #5 denied having spoken to anyone regarding the article, seen anyone with a phone talking about the article, or overheard anyone speaking about the case or an article they had read.

¶ 44 In *Keegan*, two of the twelve jurors stated explicitly prior to opening statements that they had read the prejudicial article in question. Here, none of the selected jurors indicated that they had read the *Daily Chronicle* article. Juror #5 indicated having seen a Facebook post referring tothe case a "bad drug deal," but nothing in the record suggests that the post contained any

information originating from the *Daily Chronicle* article. After the questioning of the jurors selected for trial, defendant accepted each one without challenge.

¶ 45 Immediately upon receiving information that the venire may have been exposed to the article, the trial court undertook a meaningful examination of the jurors to determine what, if any, prejudice occurred. See *Talley*, 152 Ill. App 3d at 980. The trial court determined, and the record supports, that the jurors had not been prejudiced to the extent that they could not be fair and impartial. See *People v. Fort*, 248 Ill. App 3d 301, 309 (1993). It is sufficient if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court. *Fort*, 248 Ill. App 3d at 309.

¶ 46 The *Daily Chronicle* article's contents detailing defendant's prior convictions raises a concern as to possible prejudice caused. However, given the peculiar facts and circumstances of the case-at-bar, there is no evidence to suggest the selected jurors had actually read the potentially prejudicial article as to raise speculation to the ultimately rendered verdict. As we can find no prejudice following the trial court's meaningful examination of the jurors, we will not disturb its denial of defendant's motion for mistrial.

¶ 47 Defendant next contends that the trial court erred in not granting defense counsel's motion for a mistrial following Officer Weese's testimony. He argues that Weese's testimony concerning his ride in the ambulance with Clark before his death was irrelevant, lacked probative value, and produced only a prejudicial effect. Defendant avers that Weese's display of emotion while testifying and his embrace of defendant's family in view of the jurors served to inflame sympathy in favor of the prosecution. As stated above, a trial court's denial of a motion for mistrial is reviewed for an abuse of discretion. See *supra* ¶ 40.

¶ 48 The State argues that defendant has forfeited any challenge to the relevancy of Weese's testimony. Based on the record, we agree. Prior to trial, the State filed a motion *in limine* seeking to admit statements made by Clark in Weese's presence as an exception to the hearsay rule under the dying declaration exception. Defendant did not object to the relevancy or probative value of Clark's statements, rather arguing that no evidence existed as to whether Clark made the statements under a belief of imminent death. A defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). If a defendant fails to satisfy either prong of this test, his challenge is considered waived on appeal. *Woods*, 214 Ill. 2d at 470. Thus, we will limit our analysis of defendant's contention to whether the emotion displayed during and following Weese's testimony served to prejudice the jury and compel the grant of his motion for mistrial.

¶ 49 The trial court has a responsibility to ensure that a trial is conducted in an orderly manner with proper decorum. *People v. Smith*, 2017 IL App (1st) 143728, ¶ 60. Emotional outbursts, such as a witness crying, do not require the court to order a mistrial because the court is in the best position to determine the impact on a jury of such outbursts. *Id.* Still, the court must take appropriate measures under the circumstances to ensure that the defendant receives a trial before a fair and impartial jury. *Id.* The court is entitled to considerable latitude and discretion in how it administers a trial. *Id.*

¶ 50 In *Smith*, the defendant was found guilty of first-degree murder and attempted first degree murder. At trial, a neighbor of the victims was allowed to emotionally testify in great detail regarding one victims' suffering and her attempts to aid him when the State had proved the victim's death through other testimony. *Id.* ¶ 55. During her testimony, the neighbor was hysterical and cried throughout, resulting in some jury members crying. *Id.* After describing in graphic and

painstaking detail the narrative of events surrounding the victim's death, the neighbor was shown and asked to identify certain graphic crime scene and hospital photographs, including close-up views of inflicted wounds. *Id.* ¶ 56. Following a sidebar, the trial court prevented the jury from seeing the photographs as the vicitm's death was not at issue. *Id.* ¶ 58. However, defense counsel never objected to the emotional narrative of events nor did he file a motion *in limine* to bar any part of the testimony. *Id.* ¶ 59.

¶ 51 In reversing the defendant's conviction on cumulative error grounds, the *Smith* court found that "[a]lthough the court is in the best position to determine the impact on a jury of a witness's crying, this observation was a clear indication that [the] testimony was exceedingly emotional and risked distracting the jury from the true issue at hand to reach a verdict based on the evidence. Once the court realized that [the witness] could not control her emotions, it should have taken some corrective action to best ensure that defendant received a trial before an impartial and fair jury." *Id.* ¶ 61. The *Smith* court held that corrective actions a trial court may employ to ensure a fair trial include calling for an immediate recess to allow time to regroup the witness's emotions, or immediately providing the jury with a curative instruction such as "neither sympathy nor prejudice should influence you." *Id.* ¶ 62. A trial court's election to employ neither example following a clear emotional outburst amounts to an abuse of discretion. *Id.*

¶ 52 Returning to the present case, both parties admit that Weese's testimony was emotional. He was visibly crying while testifying about his time in the ambulance with Clark on both direct and cross-examination. A recess was taken immediately following his testimony, whereupon Weese embraced and cried with Clark's family in view of the jury. However, unlike in the emotional witness described in *Smith*, Weese's emotional testimony could not be described as hysterical. There is nothing in the record to indicate an immediate recess was needed to allow

Weese to gather his emotions. What the record does indicate, and the trial court stated in denying defendant's motion for mistrial, is that it was "an emotional trial." The trial court recalled seeing emotions "on both sides of the courtroom ***." While the video of the car chase between defendant and police was played, "the relatives or family members of the defendant were crying. They have cried previously through statements that have been made as well." The trial court noted that the jury had also seen those emotional reactions. Upon the jury's return to the courtroom after the recess, the trial court provided Illinois Pattern Jury Instruction 1.01 and stated,

> "Ladies and gentlemen, at the conclusion of the last testimony of the officer, some of you may have seen that when he was leaving the room after testifying, he hugged the victim's family here today. I want to instruct you that sympathy should not influence you in any way as jurors in this case and you are not to consider that in any way as well."

¶ 53 A reviewing court should not substitute its judgment for that of the trier of fact on issues involving the credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. Based on the foregoing, we find no abuse of discretion in the trial court's denial of defendant's request for mistrial on this issue.

¶ 54 Defendant next contends that he was denied a fair trial when the State prosecutor misstated evidence and drew unreasonable inferences during its closing argument. We will address each of the State prosecutor's comments in question below.

¶ 55 It is well settled that prosecutors are afforded wide latitude in closing argument, and even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite response, and comment on the credibility

of witnesses. *Id.* In reviewing whether comments made during closing argument are proper, we must review the closing argument in its entirety and view remarks in context. *Id.* Although Illinois jurisprudence is unclear on whether a *de novo* or abuse-of-discretion standard of review is applicable to challenges regarding a prosecutor's remarks during closing argument, the appellate court can refrain from discussing the applicable standard when the result reached would be the same under either standard. See *Id*. ¶ 26. Such is the case here.

¶ 56 Defendant concedes that the State's remarks during closing argument were not objected toby defense counsel. He argues here that our review should "be through application of either plainerror analysis or ineffective assistance of counsel" as "the errors are being used to emphasize the prejudice suffered in this closely balanced case." However, defendant's brief provided to this court is devoid of any argument concerning ineffective assistance of counsel, save for its mention in the above quotation. We will limit our analysis of this contention to the context of the plain-error doctrine.

¶ 57 Plain error occurs where the defendant shows a clear or obvious error, and that either (1) the evidence is closely balanced, or (2) the error is of such magnitude that the defendant is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. *People v. Johnson,* 208 Ill. 2d 53, 64 (2003). A reviewing court typically undertakes plain-error analysis by first determining whether error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). If error is found, the court then proceeds to consider whether either of the two prongs of the plain-error doctrine have been satisfied. *Id.* at 189-90. Under both prongs, the burden of persuasion rests with the defendant. *Id.* at 190.

¶ 58 Defendant first takes issue with the prosecutor's argument to the jury that defendant never believed the shooting was justified or that his life was in danger. The State argued that

> "People who have their lives threatened don't run from the police. They run to the police. They don't leave their childhood friend behind to face whatever deadly force is going to come through that door. They don't abandon their girlfriend and children to be sitting ducks for an armed assailant and then try to say they're keeping the gun for the protection of those very people and you don't plan it in advance, and that is what this defendant did, ladies and gentlemen
>
> You cannot plan in advance to act in self-defense."

Defendant avers that the prosecutor returned to this idea later in her closing statements when she averred that

> "[H]e was fleeing, fleeing from the law in towns across the county line and he didn't stop until he got to a roadblock at Route 47, and sitting there in the driver's seat with a loaded gun in arm's reach he has two choices: surrender or die and he chose to surrender. That's how much he believed in his justification in October of 2015.
>
> If you have to be looking at your own demise before you have contact with a police officer, then you do not think that what you did was right. You do not believe it was justified. You know what you did was wrong."

Defendant argues that these statements were improper and unsupported by the evidence because "[t]here was no empirical psychological evidence offered to support the prosecutor's argument that people will always run to the police when threatened." Additionally, defendant finds the State's arguments in closing "legally incorrect" as "it is permissible, and legal, to have a gun *** to protect oneself." Defendant admits that possession of a valid FOID card is necessary to legally carry a firearm in Illinois.

¶ 59 Based on the evidence adduced at trial, the above comments by the State prosecutor were not improper. Evidence of flight is admissible as proof of consciousness of guilt. *People v. Harris*,225 Ill. 2d 1, 25 (2007). The State introduced testimony from officers and video evidence of defendant's lengthy vehicular evasion of arrest. Motsinger and defendant both testified that he ran from the scene following the shooting of Clark. The prosecutor's argument to support an inference that he did not act in self-defense was based on the uncontested fact that defendant fled both the scene of the shooting and apprehension by police. The record here supports that inference as reasonable.

¶ 60 As to defendant's characterization of the prosecutor's comments concerning his carrying a gun to Clark's residence as "legally incorrect," his own testimony destroys any merit this claim may have had. Defendant testified that he did not have a FOID card. He was not legally carrying a firearm on the night in question. When he approached Clark's residence with Motsinger, defendant had the gun hidden in his waistband. The evidence presented supports a reasonable inference that defendant was not carrying a gun hidden in his waistband on the night of the shooting for the purposes of self-defense. We find no error with the State's arguments on defendant's flight or possession of a gun.

¶ 61 Additionally, defendant argues that the prosecutor distorted the evidence by arguing that defendant

> "[D]idn't park next to the house like he did the time before. He parked blocks away so they had to walk over to the house.
>
> But you know what else that meant? It meant that any neighbors who might hear a gunshot and might look out their window and notice any cars or license plates, well, they wouldn't see his. They wouldn't see his."

Defendant maintains that there was no evidence of him parking "blocks away" from Clark's residence. He argues that Motsinger's testimony that they parked "halfway" down the street, and defendant's own testimony that he parked "down the street" support his contention that the State's comments were improper and not based on the evidence presented.

¶ 62 Motsinger testified at trial that defendant "went down Eleventh Street" and "went left on Lewis" before getting to Ninth Street where defendant then turned onto Shipman Place and "parked about halfway" between Ninth Street and Seventh Street. They then walked from the corner of Shipman Place and Seventh Street to Clark's residence at 817 Pleasant Street. Motsingerthought that defendant's parking in this location was unusual. A review of these locations supportsthe statement that defendant parked "blocks away" from Clark's residence. We can find no error with the State's characterization.

¶ 63 Finally, defendant argues that the prosecutor improperly drew an inference not supported by the evidence when she told the jury

> "[T]he gun defendant wants you to believe was in [Clark's] hand was found at the bottom
> of a backpack buried under a bunch of other stuff in an entirely different room."

Officer Sullivan testified at trial that she searched and photographed the items discovered within a backpack in the bedroom of Clark's residence. She testified that she found the items inside the backpack and photographed them in the following order: a toothbrush, one watch, a pair of earrings, tan pants, a black t-shirt, a plastic bag with an unknown substance, boxer shorts, two ecstasy pills, a jar of cannabis, and a handgun. Sullivan characterized the items were found stored "fairly neat."

¶ 64 The prosecutor's remarks on the location of the gun found by Sullivan in the backpack show that the prosecutor made a reasonable inference from the evidence presented. Although

defendant is correct in stating that the photographic exhibits do not show the order in which the items were found in the backpack, the prosecutor's inference that the gun was found beneath the other items was not out of context. Based on Sullivan's testimony and the reasonable inference that the gun was hidden in a bag containing clothes and elicit items, we can find no error with the prosecutor's remarks on the discovered location of the gun.

¶ 65 Because we find that the prosecutor's comments were reasonable inferences based on evidence adduced during trial, we need not address defendant's contentions that any such error amounted to plain error. *People v. Eppinger*, 2013 IL 114121, ¶ 19 (under the plain-error doctrine, the first step is to determine whether any error occurred). Because defendant's claims of error fail under the foregoing analysis, he cannot succeed on his claim of plain error. Accordingly, defendant is not entitled to a new trial. *Id.* ¶ 42.

¶ 66                                    III. CONCLUSION

¶ 67 For the foregoing reasons, the judgment of the circuit court of De Kalb County is affirmed.

¶ 68 Affirmed.