NOTICE

Decision filed 12/01/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180326-U

NO. 5-18-0326

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 17-CF-410 |
| | ) | |
| NATHAN D. BOWLES, | ) | Honorable |
| | ) | Mark H. Clarke, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court did not abuse its discretion by denying the motion for mistrial based on an outburst by a witness while testifying, where the defendant injected himself into the argument with the witness. The trial court took appropriate measures to ensure that the defendant had a fair trial and the evidence of aggravated battery was overwhelming.

¶ 2     The defendant, Nathan D. Bowles, was convicted of aggravated battery after a jury trial. During the victim's testimony, the defendant and victim engaged in an argument in the presence of the jury. The defendant appeals the denial of his motion for a mistrial based on statements made during the argument. For the following reasons, we affirm the judgment of the trial court.

¶ 3                 I. BACKGROUND

¶ 4     The defendant and Chad Dempsey had been friends for over 25 years. They frequently used drugs together. In the early morning of August 27, 2017, the defendant and Dempsey pooled

1

their money with the intent to buy drugs at a home in a residential neighborhood. The drug dealer raised the price and Dempsey walked away without the drugs, and with the money he and the defendant had pooled together. The defendant followed Dempsey outside and the two men had words. Dempsey was subsequently stabbed several times in the chest with the defendant's knife. In addition to the chest wounds, Dempsey suffered a neck laceration, and cuts to his hands. On that date, Dempsey was 37 years old, and the defendant was 36 years old.

¶ 5    After sustaining his injuries, Dempsey knocked on the door of a nearby house for assistance. Dempsey did not know the homeowner.  When the owner saw Dempsey, a 911 call was placed to the police.  Dempsey was taken by ambulance to Carbondale Memorial Hospital, was admitted to the emergency room, and was unstable upon admission due to the multiple stab wounds.

¶ 6    The defendant was arrested for the injuries caused to Dempsey. On August 28, 2017, the defendant was charged with two counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1), (a)(2) (West 2016)), and one count of aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2016)), for cutting Dempsey's neck with a knife and stabbing him multiple times in the chest.

¶ 7    The jury trial began on April 16, 2018. Carbondale police officer, Jarrod Livingston, testified that he was patrolling on August 27, 2017, when he received a dispatch about a possible stabbing. Livingston arrived at the scene and found Dempsey lying motionless against the storm door of a residence. A large pool of blood was underneath Dempsey and on the storm door. Dempsey was breathing, but unresponsive. Livingston tried to assess Dempsey's wounds while administering aid to stop the bleeding. Dempsey's wounds appeared to be located on the left side of his chest and on his neck. Dempsey's clothes were emergently cut off to further assess the wounds, and a folded pocketknife was found attached to Dempsey's belt. During Livingston's

2

testimony, he identified multiple photographs of the crime scene taken on August 27, 2017. Livingston also identified a photograph of the knife found on Dempsey's belt. Livingston additionally testified that he located two witnesses to the crime, Kenneth Edwards and Jesse Miller.

¶ 8    Kenneth Edwards testified that his son woke him up on the night of August 27, 2017, around 3 a.m. because someone was knocking on their front door. Edwards looked to see who was knocking. He heard Dempsey exclaim that he had been stabbed. Edwards opened the main door to his home and found Dempsey lying against the storm door. Dempsey then slid to the ground, blocking Edwards from being able to open the outer door. While Edwards was at the front door, his wife called 911. The Carbondale police were in the area and arrived shortly after the 911 call. Edwards attempted to reach Dempsey by going through the back of the house, and around to the front. The police stopped Edwards before he could reach Dempsey, who was still lying against the storm door. During Edwards' testimony he viewed the photographs of the crime scene and identified a photo of the blood on the storm door as Dempsey's.

¶ 9    Jesse Miller testified that he was Edwards' neighbor. Miller was awake on August 27, 2017, around 4 a.m. and was in his bedroom with his windows open. While in his bedroom, he heard some arguing outside, and saw two men coming around the street corner near his house. Edwards took five to seven seconds and moved from his bedroom to an indoor porch located at the front of his house to get a better look. The streetlights kept the neighborhood extremely well-lit. He watched the two men walk in the direction towards his house. The shorter person (Dempsey) was walking away from the taller person (the defendant), who continued to follow. Miller testified that he did not see any physical confrontation between the two men until they were directly in front of his house. Miller watched as the defendant reached around Dempsey from behind and made a cutting motion around Dempsey's neck. Dempsey then turned to face the defendant as Dempsey

backed away. Miller then moved from the south facing window on his porch to a west facing window, and heard Dempsey cry out, "Why did you stab me?" Miller watched the defendant continue to go after Dempsey as the victim stepped backwards until he reached the vacant lot between Miller's home and the home of his neighbor, Kenneth Edwards. Miller testified it appeared that Dempsey was trying to protect himself because his hands were up as he backed away. Dempsey again cried out, "why did you stab me?" Miller then saw Dempsey reach into his pockets. As he did so, he said, "it's not that serious. Here, take your 20 dollars." Dempsey then threw the money on the ground. Miller testified that the defendant picked up the money and went north between Miller's house and Edwards' house. Miller saw Dempsey retreat from the defendant and never saw Dempsey wave a knife at the defendant. Miller admitted he did not see the entire altercation, but saw the cutting motion to the throat and heard Dempsey ask, "Why did you stab me?"

¶ 10    The State then called Andy Trout to testify. Trout was friends with Dempsey and first met the defendant on August 27, 2017. Trout testified that he gave both Dempsey and the defendant a ride to purchase drugs but stated that he did not want to be involved with buying them. After taking the men to a neighborhood on the northeast side of town, the men walked off and Trout did not know their exact destination. Trout left and assumed they would call later if they needed another ride. About an hour after Trout dropped Dempsey and the defendant off, the defendant called Trout. Trout met the defendant at the defendant's house. Trout used crack cocaine with the defendant, the defendant's girlfriend, and another girl. Trout testified that the defendant told everyone that he had stabbed Dempsey. Trout thought the defendant was joking because they were all on drugs and Trout could not gauge the defendant's emotions. The defendant also was dancing around with a hunting knife while they were in the defendant's backyard.

4

¶ 11     Mikayla Pearson, the defendant's 18-year-old girlfriend, also testified. Pearson lived with the defendant, and they frequently used drugs together. On August 27, 2017, Pearson was locked out of the house and met the defendant as soon as he returned home. She noticed that the defendant had blood on his clothes. He immediately changed clothes when they were inside the house. The defendant told her about the incident with Dempsey. He explained to Pearson that Dempsey tried to stab him over drugs and the defendant stabbed back in self-defense. The defendant showed Pearson the knife he used. While testifying, Pearson was shown a photo of the defendant's knife that the police recovered, and she identified it as the same knife the defendant said he had used to stab Dempsey. She testified that the defendant asked her to say that she was with him the entire night, if asked.

¶ 12     Pearson further testified that after Dempsey explained what had happened earlier that evening, they proceeded to get high on crack. Later in the morning, the defendant started fighting with Pearson over the drugs and it became physical. The defendant pulled out the knife he had shown Pearson earlier and slit his own wrists. He then started to cry, told Pearson that he was going to prison for the rest of his life, and ran off behind the house. Pearson further testified that their roommate called the police. After the police arrived, they questioned Pearson about the incident with Dempsey.

¶ 13     Ryan Tripple, a Carbondale police officer, testified about responding to a suicidal attempt by the defendant on August 27, 2017. Tripple stated that the defendant had been arguing with his girlfriend in his backyard. The defendant refused to cooperate, and Tripple had to physically subdue the defendant. The officer noticed that the defendant's forearms and wrists were covered in blood. An ambulance was dispatched, and the defendant was charged with resisting arrest. They were not able to immediately locate the knife.

¶ 14    Andrew Sabens, a police officer with the City of Carbondale, testified that a K9 dog found the knife on the fence in the defendant's backyard. The knife had blood on it. A photograph was taken of the knife in its position on the fence and admitted into evidence. Sabens also identified the actual knife that was collected and placed into evidence.

¶ 15    Lieutenant Mark Goddard with the Carbondale Police Department testified that he was in charge of the Investigations Division and interviewed the defendant. Goddard met the defendant in the processing area and informed him that he was being charged with stabbing Dempsey. The defendant, in response to learning that he was being charged, denied stabbing Dempsey and asked Goddard for the name of the person who had accused the defendant of stabbing Dempsey. The defendant agreed to talk to Goddard in the interview room. Goddard testified about the information that the defendant provided him during the interrogation and authenticated video clips from the interrogation that were shown to the jury. The defendant explained during the interrogation that he chased after Dempsey when the drug dealer refused their money. The defendant claimed that Dempsey pulled out a silver folding knife and the defendant dropped to his knees to beg for his money. Dempsey told the defendant to stay back. Dempsey then slashed his knife towards the defendant's face. The defendant claimed that he stabbed Dempsey in self-defense from a kneeling position. After stabbing Dempsey, the defendant cut Dempsey across the neck. Goddard additionally testified that during the interview the defendant did not have injuries to his face and the defendant had caused the visible injuries to his own arms. The defendant admitted during the interrogation that after he took the money back from Dempsey, he went to buy drugs. The defendant also told Goddard that the defendant did not have a phone and could not call 911 for Dempsey.

¶ 16    Goddard further testified that he interviewed Dempsey after he was released from Carbondale Memorial Hospital and took photographs of Dempsey's injuries. Dempsey had sustained a knife wound to his left ring finger, right index finger, chest, and neck. Goddard described Dempsey's injuries and the photographs Goddard had taken of those injuries. All of the photos were admitted into evidence. Dempsey admitted to Goddard that he had a knife on his belt during the incident on the August 27, 2017.

¶ 17    Dempsey was also called to testify. Prior to testifying, the defendant requested that the court conduct a competency hearing of Dempsey. Dempsey had a learning disability and a prior criminal history where he had been evaluated and found unfit. The trial court reviewed Dempsey's criminal files. Although the trial court was hesitant to conduct a competency hearing of the State's witness, the trial court questioned Dempsey and found him competent to testify. The State raised an issue with the court indicating that Dempsey may volunteer information and requested permission "not to treat the witness hostile necessarily but to assert some level of direction which could be objectionable to the Defense." Counsel for the defendant stated that he was not objecting to the State's request to avoid objectionable hearsay or inadmissible evidence by Dempsey. The trial court understood that the witness had "special needs or concerns" and stated that "it's our job to try to make sure that the jury hears everything they're supposed to hear and nothing they're not supposed to hear."

¶ 18    During the State's direct examination, Dempsey confronted the defendant and the following colloquy transpired in front of the jury:

> "THE STATE: You have to listen to me now. Okay? The reason you said you've known him for 20 years and—
>
> DEMPSEY: Run it through me in the joint though.
>
> THE STATE: Would you listen to me?

DEMPSEY: He's talking to me. So I don't know.

THE STATE: Well just listen to what I'm talking to you. Okay? Would that be, would that be fair?

DEMPSEY: More than fair.

THE STATE: The reason that, that you said that he did this to me and you've known him for 20 years, what was your relationship before he did this to you?

DEMPSEY: Know what? A friend.

THE STATE: Best friends?

DEMPSEY: Pretty much, I thought. I would ask him why, why did you do this to me?

THE DEFENDANT: You robbed me, Dude. You robbed me.

THE STATE: Okay. Just a second.

THE DEFENDANT: You f*** snatched my f*** money—

THE STATE: Just a second. Now he's not—

DEMPSEY: Did I try to stab you?

THE DEFENDANT: You snatched my f*** money. If you follow me, we're f*** fighting. You didn't say that sh***?

DEMPSEY: Did I try to stab you?

THE COURT: Excuse me. I'm sorry, sir. I apologize for the interruption.

DEMPSEY: I don't know. Did I try to stab you?

THE STATE: Just a minute.

THE COURT: Mr. Bowles, I understand that the situation—

THE DEFENDANT: I'm looking at 30 years, man!

THE COURT: Sir—

DEMPSEY: Did I try to stab you?

8

THE DEFENDANT: You f*** robbed me. I didn't say sh*** to the cops.

THE COURT: Okay.

DEMPSEY: Say sh*** to the cops?

THE COURT: Let's just take a moment. All right?

DEMPSEY: I got you on video, Boy.

THE COURT: Excuse me.

DEMPSEY: I got you on video, Nathan.

THE STATE: Just a minute.

THE COURT: Ladies and gentlemen of the jury, we're going to take a moment—outside—

DEMPSEY: I got you on video.

THE DEFENDANT: When I said I don't want to press no charges, man?

DEMPSEY: I got you on video.

THE DEFENDANT: —you stating you don't want to press no charges, Bro.

(Jury is exiting courtroom.)

DEMPSEY: You said I tried to stab you. You better hope I don't run into you in the joint. You better get in there lifting weights, because you know you can't see me in hands. That's why you had to use that knife.

THE COURT: Please, step out.

DEMPSEY: Hey, I'll step out. I'll stay out.

THE COURT: No. I said stop.

DEMPSEY: This Dude is going to beat me. I can't handle it. He acts like he's all macho man. That's why he had to use a knife.

THE COURT: All right. Here we are. We're outside the presence of the jury. Let's take the witness outside for just a moment."

9

¶ 19    As soon as the jury and Dempsey were outside of the courtroom, the trial court admonished the defendant as follows:

> "THE COURT: All right. Mr. Bowles, this is the situation that I find myself in: You've got an attorney who, by all accounts, is doing a very capable job and, right now, the jury has just seen you do and say some things that could affect their view of you and falling into the temptation of expressing yourself by your words and actions, and showing the jury a picture of a man is undermining your defense, sir, and that is you doing it.
>       Now, here's my problem, as a Judge, I'm supposed to make sure that everybody behaves themselves and all of the choices that are available to me to make people behave themselves are choices I don't want to make; but even if I was just worried about disruptions in the courtroom, I would be more worried about the fact that I'm supposed to guarantee you a fair trial.
>       Now, the reality is that witnesses come to testify, and witnesses say things that may be damaging to your side and that's part of every case, and your attorney is supposed to respond in ways within the rules to expose weaknesses in the State's case, and it requires calm methodical questioning of witnesses."

¶ 20    The defendant apologized to the trial court in response to the court's admonishment. Defense counsel then made a motion for a mistrial based on the outbursts by Dempsey and the defendant. The defendant's counsel argued that "the mention of the possible prison term and a myriad of other reasons" interfered with the defendant's ability to have a fair trial. The trial court denied the motion and reasoned that the defendant's outburst was not going to be the basis for granting a mistrial. The trial court believed the outburst was a strategy of the defendant and the court was not going to reward the defendant's behavior.

¶ 21    Before the jury returned, the State requested that the trial court give a curative instruction to the jury. In response, the defendant again asked for a mistrial. The trial court stated that it had already denied the mistrial and gave the defendant the option of providing the jury with curative instructions. The defendant did not object to the instructions. Prior to Dempsey's testimony resuming, the trial court told the jury that they were responsible for listening to the evidence that "comes from the witness stand and not from anywhere else in the courtroom." The trial court gave further instructions and explained that "the person who says something sitting at counsel table is

10

not testifying. Attorneys argue. They give opening statements, closing arguments but that's not testimony." The trial court explained that the defendant had not taken an oath, he did not have to testify, and he had not yet provided testimony. The jury was instructed not to consider the statement about prison mentioned during the argument. The trial court explained that the jury will have to make decisions based on the evidence, whether the State met its burden of proof, and based on the law that will be given to them.

¶ 22   After the court instructed the jury, Dempsey's testimony resumed. He testified about the extent of his wounds.  Dempsey also testified that he did not provoke the defendant by threatening him with a knife. Dempsey further testified that he had learning disabilities and had a history of heroin use.

¶ 23   Throughout Dempsey's testimony, he had a difficult time answering the questions posed to him. The defendant's counsel objected numerous times during Dempsey's testimony. At one point, the defendant's counsel objected to hearsay and speculation. Before ruling on the objection, the trial court removed the jury from the courtroom again. The trial court expressed concern about the potential for the jury to hear inadmissible information from Dempsey's testimony. The trial court believed that Dempsey met the competency standards but understood that Dempsey had a difficult time focusing on the questions and would say what was on his mind. The State suggested that the trial court explain to Dempsey that he is only to answer the questions posed to him. The defendant did not object and the trial court spoke to Dempsey outside of the jury's presence. The trial court explained to Dempsey that he was required to answer the questions asked and if he did not do so, then the court may stop his testimony. The jury was then returned to the courtroom and questioning resumed. The State interjected numerous times during Dempsey's testimony to direct Dempsey to answer the question.

11

¶ 24 On cross-examination, Dempsey agreed that he had prior convictions for obstruction of justice for destroying evidence and for retail theft. Dempsey also testified that he initially told Lieutenant Goddard that the incident was over a Bluetooth speaker because Dempsey did not want to admit that it was about a drug deal. Dempsey stated he was "very high" on the night of August 27, 2017; he had used about a tenth of a gram of heroin; and he had smoked marijuana. Dempsey also testified that before they went to buy drugs, the defendant put a knife on Dempsey's belt for protection against the drug dealer. Dempsey stated that he was not aware that he had a knife on his belt when he was stabbed by the defendant, and he never took the knife off of his belt.

¶ 25 After the State rested, the defendant made a motion for a directed verdict. The defendant claimed that the State failed to prove the defendant guilty beyond a reasonable doubt on all three counts brought against the defendant and that the State failed to prove the defendant's actions were not legally justified. The trial court disagreed and denied the defendant's motion.

¶ 26 The defendant then testified in his own defense. He indicated that he had been friends with Dempsey for about 25 years. The defendant also claimed that it was not the first time that Dempsey had pulled a knife on the defendant and taken his money. The defendant claimed that Dempsey had injured the defendant on multiple other occasions. The defendant testified that on August 27, 2017, at approximately 1 a.m., Dempsey's friend, Trout, drove Dempsey and the defendant to a residential neighborhood on the east side of town, about two blocks away from the drug dealer's house. The defendant wanted to buy cocaine and Dempsey wanted heroin. When they attempted to buy the drugs, they were short on cash and the dealer returned the money to the defendant. The defendant claimed that while they were at the dealer's house, Dempsey grabbed the drug money out of the defendant's hands and pulled out his knife. Dempsey threatened the defendant and said "if you come after me, we're going to be fighting. I'll f*** stab you." Dempsey then walked away.

12

The defendant followed, begging for Dempsey to return the money. Dempsey then pulled a knife a second time and said, "Stay back. I'll kill you." In response, the defendant testified that he dropped to his knees and Dempsey swiped the knife at him. Dempsey then continued to walk away, and the defendant continued to follow him, asking for the money. The defendant testified that when he caught up to Dempsey, he put his hand on Dempsey's shoulder and Dempsey spun around to face him. At that point, the defendant had taken out his own knife, as he believed that Dempsey was holding a knife. The defendant then stabbed Dempsey, and claimed Dempsey dropped his knife as he grabbed at the defendant's knife. The defendant claimed that he intended to push Dempsey away, and as Dempsey's hands came up, the defendant caught Dempsey's neck with the knife. At that point, Dempsey tried to grab the knife and injured his hand. Then Dempsey pulled out the money and threw it on the ground.

¶ 27 On cross-examination, the defendant admitted that he initially told police that he did not know Dempsey was stabbed. Throughout the defendant's testimony, he admitted that he had lied to not get arrested. Regardless of the question posed to him, the defendant interjected comments several times and made numerous extemporaneous statements. The trial court instructed the defendant multiple times during his testimony to answer the question without the additional commentary and to allow his attorney to ask follow-up questions. At one point during the defendant's testimony, the court removed the jury from the courtroom to allow the defendant time to settle down and speak to his attorney. During the defendant's testimony, the defendant admitted he used cocaine from the time of the stabbing until he was arrested by the police. He claimed that he was under the influence of drugs during his interview at the police station.

¶ 28 At the conclusion of the defendant's testimony, the parties rested. The jury was excused while the jury instructions were discussed and agreed upon. The State then presented its closing

13

argument to the jury. The State argued that the defendant's testimony was inconsistent. The State additionally argued that Dempsey was not the only witness and focused on Miller's credible testimony. Defense counsel's closing argument focused on the defendant's claim that he acted in self-defense after Dempsey threatened to kill the defendant. Counsel acknowledged that the defendant was a drug addict with self-control issues that affected his behavior in the courtroom. Defendant's counsel also attacked Dempsey's credibility and argued that Miller did not observe the entire altercation.

¶ 29 After closing arguments, the trial court provided the jury with multiple instructions. The trial court included the following statement in the jury instructions:

> "You are to apply the law to the facts and in this way decide the case. You are not to concern yourself with possible punishment or sentence for the offense charged during your deliberations. It is the function of the trial judge to determine the sentence should there be a verdict of guilty. Neither sympathy nor prejudice should influence you."

¶ 30 The jury began deliberating around 2:35 p.m. on April 18, 2018. At approximately 5:20 p.m., the bailiff received a note from the jury indicating that they were in agreement on one charge and substantially divided on the other charge. The trial court responded to the jury that they were to continue their deliberations. Subsequently, the jury sent out additional notes indicating they were in agreement on the aggravated battery charge but deadlocked on the attempted first degree murder charge. Due to a juror's medical condition, the jury went home for the evening at approximately 9 p.m. and returned the following morning to continue with deliberations. On April 19, 2018, at about 12 p.m., the jury continued to be divided and stopped deliberating. The jury found the defendant guilty of aggravated battery. They were not able to agree on a verdict on the charge of attempted first degree murder.

¶ 31 On May 18, 2018, the defendant filed a motion for new trial. The motion included the argument that the defendant was denied a fair trial and prejudiced by Dempsey's comments

regarding the defendant going to prison. The defendant also argued that the trial court erred in finding Dempsey competent to testify as a witness for the State, and that Dempsey's behavior and demeanor on the stand was inappropriate. The defendant argued he did not receive a fair trial because Dempsey had argued directly with the defendant in front of the jury, ignored direct questions, and provided stream of consciousness thoughts rather than testimony.

¶ 32    On May 23, 2018, during the motion hearing for a new trial, the court considered the outcome of the trial without Dempsey's testimony. The court did not believe Dempsey's testimony was necessary to the outcome of the trial. The trial court considered Dempsey as "a man with some problems *** whose buttons can be pushed." The court found the defendant's conduct to be improper, indicating that "the defendant took ample opportunity to push Mr. Dempsey's buttons while he was up on the stand." The trial court considered Miller to be a credible and compelling witness. Miller's testimony, along with the rest of the evidence related to the elements of the offense, was compelling, and the trial court believed it was sufficient to convict the defendant. The trial court denied the defendant's motion for new trial.

¶ 33    On May 23, 2018, after denying the motion for new trial, the defendant was sentenced. The trial court imposed an eight-year sentence followed by a one-year period of mandatory supervised release. This appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, the defendant claims that the trial court abused its discretion by denying his motion for a mistrial following the outbursts by the witness and the subsequent exchange of arguments before the jury. The State asserts that the alleged error was harmless, evidence of the defendant's guilt was overwhelming, and the defendant's conviction and sentence should be affirmed.

15

¶ 36    A mistrial should be granted "where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). The trial court has broad discretion to grant a mistrial and its determination will not be reversed unless there was a manifest necessity for mistrial or the ends of justice would be defeated by continuing with trial. *People v. Robinson*, 121 Ill. App. 3d 1003, 1014 (1984). The jury would have to be influenced and prejudiced by the outburst that it would no longer be fair and impartial, and the damaging effect could not be remedied by instructions or admonitions. *Robinson*, 121 Ill. App. 3d at 1014.

¶ 37    A defendant must object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). The defendant moved for a mistrial after the outbursts and raised the issue again in his posttrial motion. The defendant has, therefore, preserved the issue of the denial of mistrial for review.

¶ 38    The trial court's decision to deny a defendant's motion for a mistrial is reviewed for abuse of discretion. *Bishop*, 218 Ill. 2d at 251. "An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or no reasonable person would take the view adopted by the trial court." *People v. Delvillar*, 235 Ill. 2d 507, 519 (2009).

¶ 39    The trial court has a responsibility to ensure that a trial is conducted in an orderly manner with proper decorum. *People v. Smith*, 2017 IL App (1st) 143728, ¶ 60. A genuine emotional outburst by a witness does not necessarily require a mistrial. *People v. Sambo*, 197 Ill. App. 3d 574, 583-84 (1990). Appropriate measures must be taken by the trial court when outbursts occur to ensure that the defendant receives a trial before a fair and impartial jury. *Smith*, 2017 IL App (1st) 143728, ¶ 60.

16

¶ 40    In *Smith*, during a murder trial, the trial court allowed a witness to provide emotional testimony that described the victim's suffering while the victim was dying even though the State had proved the victim's death through other evidence. *Smith*, 2017 IL App (1st) 143728, ¶ 55. The witness in *Smith* was hysterical and cried throughout her testimony. *Smith*, 2017 IL App (1st) 143728, ¶ 55. Jury members cried as well. *Smith*, 2017 IL App (1st) 143728, ¶ 58. The defendant in *Smith* did not object to the emotional outburst; nevertheless, the trial court was obligated to take appropriate measures to ensure that the defendant received a fair trial before a fair and impartial jury. *Smith*, 2017 IL App (1st) 143728, ¶¶ 59-60. The *Smith* court indicated that corrective actions that the trial court could have taken to ensure a fair trial before an impartial and fair jury included calling for an immediate recess to allow time to calm down the witness's emotions or immediately providing the jury with a curative instruction such as "neither sympathy nor prejudice should influence you" (see Illinois Pattern Jury Instructions, Criminal, No. 1.01(5) (4th ed. 2000)). *Smith*, 2017 IL App (1st) 143728, ¶ 62. In *Smith*, the trial court abused its discretion by not immediately taking any corrective action. *Smith*, 2017 IL App (1st) 143728, ¶ 62.

¶ 41    Here, unlike in *Smith*, prior to Dempsey's testimony, the trial court was alerted to possible issues with Dempsey as a witness that may have interfered with the defendant receiving a fair trial. The defendant had asked the court to evaluate Dempsey to determine if he was fit to be a witness. The trial court found Dempsey competent to testify. The defendant did not object to the State asking for leeway in an effort to control the witness's testimony, knowing the witness had difficulty responding to the questions asked. Before his testimony began, the trial court was aware that Dempsey's understanding of the courtroom behavior and decorum was limited.

¶ 42    While testifying, Dempsey addressed the defendant directly and an argument unfolded between the two. The jury was present as the two continued to argue. The trial court immediately

17

interjected in an effort to stop the interruption. As the argument continued, the trial court removed the jury from the courtroom. The defendant requested a mistrial, and that motion was denied. The trial court offered to provide a curative instruction. The defendant did not object to the language of the instruction. The trial court instructed the jury that the defendant's statements from the counsel table should not be considered as evidence and the jury was charged with listening to the evidence from the witness stand, following the law, and making a decision based solely on the evidence and law provided. The trial court's effort to eliminate prejudice through instructions to the jury immediately after the emotional outburst exceeded the suggested jury instruction recommendation in *Smith*. *Smith*, 2017 IL App (1st) 143728, ¶ 62. Unlike in *Smith*, the trial court here made efforts to avoid the prejudicial impact of the outburst as an alternative to granting a mistrial.

¶ 43    The trial court did not ignore the fact that the defendant participated in the outburst in front of the jury. A defendant may not receive a second trial on the basis of error that he injected into the proceedings. *People v. Cortes*, 181 Ill. 2d 249, 283 (1998). The defendant's motion for mistrial was partially based on the fact that the jury heard the statement that the defendant was facing 30 years in prison. The defendant injected those words of the possible prison term into the proceeding when he argued with Dempsey.

¶ 44    The trial court not only observed the outburst, but also the continued conduct between Dempsey and the defendant. A trial court is in the best position to determine the impact of a witness outburst on a jury and is entitled latitude and discretion in how it administers a trial. *Smith*, 2017 IL App (1st) 143728, ¶ 60. When the trial court removed the jury during the initial outburst, the trial court admonished the defendant and said, "the jury has just seen you do and say some things that could affect their view of you." Even after Dempsey's testimony resumed, Dempsey made

18

another statement towards the defendant. When Dempsey was admonished by the State, Dempsey responded that, "He [(the defendant)] keeps talking to me. I'm trying to not talk to him." When Dempsey continued to make statements not related to questions asked, the defendant objected, and the trial court stopped Dempsey's testimony a second time.

¶ 45    After removing the jury again, the trial court acknowledged that Dempsey was a difficult witness, and stated, "every time the defendant chooses to make a face, he [(Dempsey)] chooses to respond. I'm mindful. I'm sitting here looking at what's going on in the room tit for tat somewhat, and yet, at the end of the day, it's my job to make sure this trial is fair." The trial court again explained to Dempsey, outside the presence of the jury, that Dempsey needed to answer the questions asked, or his testimony may stop.

¶ 46    The defendant argued that the substantial prejudice of the courtroom outburst did not vanish from the jurors' minds, even with the corrective actions by the trial court. Since the defendant preserved the issue on review, the State bears the burden of showing the error was harmless beyond a reasonable doubt. *People v. Johnson*, 238 Ill. 2d 478, 488 (2010). "When deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Lindsey*, 2013 IL App (3d) 100625, ¶ 39. The State argues that the evidence supporting the verdict of aggravated battery was overwhelming.

¶ 47    The defendant claimed he stabbed Dempsey in self-defense. The defendant's argument is unavailing, considering the testimony of Miller. Miller witnessed the incident and testified that he could hear and see the defendant and Dempsey arguing. Miller testified that after he heard arguing

19

he took between five to seven seconds to move from his bedroom window to the south facing window. Miller then watched the defendant come from behind Dempsey and make a cutting motion to Dempsey's throat. At no time did Miller see Dempsey waving a weapon at the defendant. Miller watched Dempsey step backwards, with his hands up. Miller again changed windows as Dempsey backed away from the defendant. Miller was able to hear Dempsey say, "why did you cut me?" and "why did you stab me?" Miller also testified that he heard Dempsey say, "it's not that serious. Here, take your 20 dollars."

¶ 48    The defendant admitted that he was going to use money to purchase drugs. Later that evening, while using drugs with his friends, the defendant admitted that he had stabbed Dempsey. The defendant cut himself with the same knife he used on Dempsey and then hid the weapon. The defendant admitted that he was high on drugs at the police station while being interviewed. He admitted that he initially lied to the police about what had happened. The defendant's girlfriend saw the defendant covered with blood soon after the incident. She testified that the defendant asked her to lie and say that he was with her all night.

¶ 49    Dempsey testified that he had learning disabilities. He also testified that he was on heroin and marijuana on the night of the incident. Dempsey had a criminal history and admitted to lying to the police when asked about the altercation on the night of August 27, 2017. Harmless error occurs where the result of the trial would have been the same absent the error. *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 33. Regardless of the outburst that involved both Dempsey and the defendant, the evidence against the defendant was overwhelming.

¶ 50    Prejudicial impact of the outburst was avoided where the trial court removed the jury, admonished the defendant, and provided instructions to the jury before testimony resumed. The trial court also provided instructions to the jury prior to deliberations. The trial court was in the

20

best position to see the defendant, the witnesses, and the impact of the outbursts on the jury. The trial court did not err when it considered the defendant to have improperly injected himself into Dempsey's outbursts and the argument between the two men. Since the trial court took appropriate measures to ensure that the defendant had a fair trial, the trial court did not abuse its discretion by denying the motion for mistrial based on the arguments that occurred in the presence of the jury. The evidence of aggravated battery was overwhelming, despite the outbursts. Moreover, if there was any error, it was harmless beyond a reasonable doubt.

¶ 51                                    CONCLUSION

¶ 52     For the reasons stated above, the decision by the trial court is affirmed.


¶ 53     Affirmed.